Shaveka GIBSON, Plaintiff,

v.

THE FINISH LINE, INC. OF
DELAWARE, Defendant.

Civil Action No. 3:01CV–153–S.

United States District Court,
W.D. Kentucky,
at Louisville.

April 25, 2003.

Brian C. Edwards, Louisville, KY, for plaintiff.

John O. Sheller, Emily S. Norris, Smith & Smith, Louisville, KY, for defendant.

## MEMORANDUM OPINION

SIMPSON, District Judge.

This matter is before the court on motion of the defendant, The Finish Line, Inc. of Delaware ("Finish Line"), for summary judgment pursuant to Fed.R.Civ.P. 56. (DN 17). Plaintiff, Shaveka Gibson ("Gibson"), alleges that her employer, Finish Line, created a hostile work environment, terminated her employment in retaliation for reporting the existence of the hostile work environment, and terminated her on the basis of her religion in violation of KRS Chapter 344.

### Background

Finish Line is a retailer of sporting apparel, athletic shoes and related items. Finish Line hired Gibson to work as a part-time sales associate at its St. Matthews Mall store in July of 1998. Gibson worked there until she resigned in July 1999. During that time, she eventually achieved the position of head cashier. In December of 1999, Finish Line rehired Gibson to work as a part-time sales associate at its Bashford Manor Mall store.

In March of 2000, Gibson began to discuss the possibility of converting her religion from Baptist to Muslim. Gibson tes-

tified that there are two steps to becoming a Black Muslim. The first step is deciding to learn about the Nation of Islam. Once that step is completed, the next step is formal conversion. On April 2, 2000 she informed a Finish Line co-worker that she had made the step of learning more about Islam and becoming a Muslim. This conversation occurred after a store meeting. Tracy John ("John"), one of the assistant managers of the Bashford Manor store, was within two or three feet of Gibson and overheard the conversation.

Outside of Gibson's presence, John conveyed the information she overheard to Reyhan Falls ("Falls"), the manager of the Bashford Manor store, Robert Gilbert ("Gilbert"), the former manager of the store, Stewart Brown ("Brown"), another assistant manager at the Bashford Manor store, and Shawn Taylor ("Taylor"), a non-employee, who worked for another shoe store in Bashford Manor Mall. John revealed that because she is white and perceived the Black Muslim sect as racist, she did not feel comfortable working with Gibson.

Although Gibson did not actually overhear the conversation John had with these individuals, she learned of it from Brown and Taylor. Gibson testified that these individuals told her John "said I was a racist, my religion, which I believed in, was worse that Ku Klux Klan. She didn't feel comfortable working around me. She felt threatened by my presence."

On April 4, 2000, after learning of John's comments, Gibson went to Falls to discuss the situation. Falls suggested that Gibson discuss the comments with John on a one-on-one basis. In response to her concerns, Gibson alleges that Falls said that if John were not comfortable working with Gibson, Falls would have to let Gibson go. Gibson never addressed John about the comments because she did not feel comfortable doing so.

Falls formally disciplined John for the comment she made regarding Gibson's religion by issuing a standard of conduct warning dated April 7, 2000. Gibson, however, maintains that the discipline did not actually occur until after she was discharged on April 10.[1]

After she spoke with Falls on April 4, 2000, Gibson called the president of Finish Line, Joe Grabbit, and informed him of the situation with John. Grabbit advised Gibson that the matter would be looked into.

During this entire period, Gibson never heard John make any comments about her religion. Gibson only testified that John was acting "silly" towards her, didn't speak to her, and gave her dirty looks. While Gibson classified the behavior as immature, she testified that "it was not that serious." On Sunday, April 9, 2000, Gibson's day off, she visited Finish Line with her aunt in order to use her discount to purchase a pair of shoes. Brown was in the front of the store. Gibson is unsure if there were any other employees in the store that day. Gibson selected two pairs of shoes to purchase—one children's shoe in size 6 and one women's shoe in size 7 or 7½. Based upon Falls' policy that he be contacted anytime an employee attempted to use the Finish Line discount, Brown contacted Falls. Brown informed Falls that Gibson was using her discount and the size and style of shoes she was purchasing. Brown then handed Gibson the phone, and Falls asked her why she was purchasing two different shoe sizes and for whom she was purchasing the shoes. Gibson explained that the children's size is equiva-

---

1. Based on information Gibson claims to have learned from Brown, she believes that Falls backdated the document.

lent to the women's size and both sizes fit her foot, a fact unknown to Falls.

At that point, Gibson admitted that she got mad and threw down the phone. Gibson then said "this is bull shit" and walked out of the store.[2] Gibson and Brown have both stated that there were no customers in the store at the time. After Gibson's outburst she walked outside of the store and sat down on a bench. Brown came out and talked to her about the situation, and she apologized to him for the way she acted. Brown then called Falls, and Gibson also apologized to him. Gibson testified that Falls said "we're straight. Everything will be all right."

Upon returning to the Finish Line for her previously scheduled work shift on April 11, 2000, Gibson was notified that she was being terminated. The notice stated that she was being terminated for using loud and offensive language on the sales floor of Finish Line, for unbecoming and disorderly conduct on Finish Line premises, and her use of profane, obscene or abusive language.

After the termination, an individual from the corporate human resources office of Finish Line contacted Gibson to follow up on her call with Mr. Grabbit. Gibson informed this individual that she could speak with her lawyer.

### Legal Analysis

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Felix v. Young*, 536

F.2d 1126, 1134 (6th Cir.1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir.1962).

■ Gibson brought her claims of hostile work environment, wrongful discharge, and retaliation under the Kentucky Civil Rights Act, KRS 344, which makes it an unlawful employment practice for an employer to:

> fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . religion.

The Kentucky Civil Rights Act provides for execution of the policies embodied in

---

**2.** According to John, who claims to have also been in the store at the time of the alleged incident, there were customers in the store at the time and Gibson "slammed down the phone, hanging up on Reyhan (Falls). After she hung up, she yelled out in front of customers Fuck Reyhan, Fuck Finish Line, and

Fuck the little bitches up in here. Yeah, Finish Line has a lawsuit coming to 'em (sic), and I quit!" However, for purposes of a motion for summary judgment, we must consider the facts in the light most favorable to Gibson, the non-moving party.

Title VII of the Federal Civil Rights Act of 1964 as amended. KRS 344.020. In order to establish a violation of the Kentucky Civil Rights Act, a plaintiff must prove the same elements as required for a prima facie case of discrimination under Title VII. *Talley v. Bravo Pitino Restaurant, Ltd.* 61 F.3d 1241, 1250 (6th Cir.1995). Therefore, Kentucky courts often look to interpretation of the federal law for guidance in applying the Kentucky Civil Rights Act. *Kentucky Comm'n on Human Rights v. Commonwealth,* 586 S.W.2d 270, 271 (Ky.App.1979).

 The United States Supreme Court established a framework for analyzing an employment discrimination case where the plaintiff's claim is based on circumstantial evidence in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802, 93 S.Ct. 1817. If the plaintiff succeeds in establishing a prima facie case, which creates a presumption that the defendant unlawfully discriminated against the plaintiff, the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). However, the ultimate burden of persuasion always remains with the plaintiff. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

### 1. Gibson's Hostile Work Environment Claim

 Unlawful employment discrimination is not limited to economic or tangible discrimination. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Discrimination so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment" violates Title VII. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, (1986).

 In order to establish a prima facie case of hostile work environment discrimination, Gibson must establish that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial and/or religious harassment; (3) the harassment was based on race or religion; (4) the harassment had the effect of unreasonably interfering with Gibson's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999).

 Gibson alleges that by virtue of her affiliation with the Nation of Islam and the Black Muslims, she is a member of a protected class, and was discriminated against based upon her religion. Finish Line argues that Gibson may not be a member of a protected class because at the time of the events in question, she had not converted to the Black Muslim sect, and at the time of her deposition remained unable to answer questions about the basic tenets of her religion.[3]

---

**3.** Finish Line also argues that the Nation of Islam could be construed as a nonreligious, sociopolitical philosophy which is not covered by the statutory requirements for religion.

The case cited by Finish Line involves a plaintiff who was terminated because of his membership in the United Klans of America. The

KRS 344.030 defines "religion" as "all aspects of religious observance and practice as well as belief." Gibson maintains that she has taken the first of two steps to becoming a Muslim, by deciding to learn more and enhance her existing beliefs of the tenets and principles of the Muslim religion. Moreover, Gibson attends services at the mosque on a regular basis, meets with a spiritual advisor, prays daily, and maintains a strict diet in order to further her religious beliefs. In the case at bar, plaintiff claims that she was discriminated against for her Muslim beliefs and practices.

██ However, even viewing the evidence in the light most favorable to Gibson, we do not find that she can established the existence of a hostile work environment. To determine whether a hostile work environment exists, we are required to consider all circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 23, 114 S.Ct. 367. The "conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp.* 191 F.3d 647, 658 (6th Cir.1999).

Gibson did not subjectively regard the environment as abusive. When questioned about John's behavior, Gibson admitted that she considered it "not that serious." At best she considered it silly, or immature. Moreover, the environment was not objectively hostile. Gibson can point to only one comment made by John, and that comment was made outside of her presence. The Sixth Circuit has held that offhand and isolated comments do not amount to "discriminatory changes in the terms and conditions of employment." *Hafford,* 183 F.3d at 512.

As Gibson has not established the existence of a hostile work environment, we need not consider the issue of employer liability. Gibson's hostile work environment claim must be dismissed as a matter of law.

## 2. Intentional Religious Discrimination

██ In order to establish a prima facie case of intentional religious discrimination, Gibson must prove that (1) she was a member of a protected class; (2) that she was qualified to continue her job; (3) that she was subjected to an adverse action by her employer; and (4) for the same or similar conduct, she was treated differently than similarly-situated non-protected employees. *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000).

██ Gibson has established the first three factors. By virtue of her religion, she is a member of a protected class. In addition to her seventeen months of satisfactory employment with Finish Line, the testimony of assistant manager Brown established that Gibson was qualified to continue her job. Gibson was subject to an adverse employment action by Finish Line when she was terminated. Therefore, the only issue is whether she has established that she was treated differently than similarly-situated employees for the same or similar conduct.

To qualify as similarly-situated in the disciplinary context, the Sixth Circuit has required that:

Muslim faith is distinguishable from the United Klans of America.

the plaintiff and the colleagues to whom he seeks to compare himself must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* To support her contention that other similarly-situated employees were treated differently, Gibson supplies the affidavit of assistant manager Brown, who stated he "recalls hearing other employees of the Finish Line on numerous occasions use inappropriate language without being subjected to any internal disciplinary action." Gibson does not identify any particular individuals by race or religion, establish that they had the same supervisor, show that they behaved in a similar way, or used "inappropriate language" towards supervisors or in the same context. Without such evidence, Gibson cannot establish that she was treated differently than other similarly-situated employees. Therefore, her claim for intentional religious discrimination must be dismissed as a matter of law.

### 3. Retaliation

■ In order to establish a prima facie case of retaliation, Gibson must prove that: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000).

Gibson has provided proof that she engaged in a protected activity, that is she opposed a comment made by a Finish Line assistant manager that was based on her religion. Because she complained to Falls, the manager of the Bashford Manor store, and Grabbit, the president of the company, Finish Line knew of Gibson's activity. Gibson was thereafter terminated from her employment with Finish Line. Therefore, Gibson's claim turns on whether there was a causal connection between her complaint to Falls and her termination.

The Sixth Circuit has looked to the temporal proximity of the adverse action to the protected activity to determine whether there is a "causal connection." *Harrison v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 80 F.3d 1107, 1118 (6th Cir.1996).

■ Gibson alleges that when she complained about John's comment to Falls, she was told that if her religious affiliations caused other employees to be uncomfortable around her, she would be discharged, and within one week of being told this was discharged by Finish Line. Falls' comment along with the temporal proximity of Gibson's complaint and her termination, raise a material issue of fact as to whether a causal connection exists.

Once Gibson has established a prima facie case of retaliation, the burden shifts to Finish Line to articulate a legitimate, nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Finish Line has articulated a legitimate nondiscriminatory reason for terminating Gibson: she violated three Finish Line work rules:

Gibson received the Handbook outlining Finish Line's Standards of Conduct, and she knew that profane language, rude conduct and disorderly behavior all constituted grounds upon which an employee could be terminated. Notwithstanding her awareness of these rules, she created a scene on Finish Line premises, complete with phone-throwing and use of curse words. Because Gibson's be-

havior ran afoul of Finish Line's Standards of Conduct, she was discharged. *Finish Line's Motion for Summary Judgment* at 28.

Therefore, the burden shifts back to Gibson to demonstrate that reason offered by Finish Line was pretextual. Gibson may demonstrate that Finish Line's explanation was merely pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that the proffered reason was not sufficient to motivate the discharge. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 759 (6th Cir.2000).

Gibson has produced the affidavit of Simon Brown, the assistant manager who issued her termination. Brown stated that he "did not believe that Shaveka Gibson's conduct warranted her discharge." This statement takes great significance as Brown is the very individual responsible for Gibson's termination. For purposes of summary judgment, we must take this statement as true. The fact that Brown is no longer an employee goes to his credibility, and must be considered by the finder of fact.

Moreover, the circumstances, taken in the light most favorable to Gibson, create a question of fact as to whether Finish's Line proffered reason actually motivated the discharge. According to Gibson and Brown, Gibson was off duty at the time of the outburst, there were no other customers in the store, and inappropriate language was used by other employees on numerous occasions without any disciplinary action. Further, both the employee handbook and the standard of conduct form documenting Gibson's termination contain several levels of discipline before termination including verbal warning, counseling, final warning, and suspension. See *Finish Line Retail Employee Handbook* at 42–43, attached as Exhibit V to Finish Line's Motion for Summary Judgment; *Standard of Conduct Form,* attached as Exhibit III to Plaintiff's Response. Gibson was not subjected to any of these disciplinary actions before her termination. This, taken with the nature of Gibson's rule violation, and her 18–month history with Finish Line, raise a material issue of fact as to whether Gibson's conduct violations were the actual reason for her discharge. Therefore, summary judgment is not appropriate to adjudicate Gibson's retaliation claim.

For the reasons set forth above, the motion of the defendant, Finish Line, for summary judgment will be **GRANTED** as to plaintiff Shaveka Gibson's hostile work environment, and intentional religious discrimination claims. Summary judgment will be **DENIED** as to Gibson's retaliation claim. Summary judgement will be entered by a separate order.