**THE BOARD OF REGENTS OF NORTHERN KENTUCKY UNIVERSITY, Appellant**

v.

**Andrea WEICKGENANNT, Appellee**

2013–SC–000820–DG

Supreme Court of Kentucky.

RENDERED: MARCH 17, 2016

---

**21.** 860 S.W.2d 760, 762 (Ky. 1993)(emphasis added).

COUNSEL FOR APPELLANT: Michael Wesley Hawkins, Andrew Bret Millar, Kathleen A. Carnes, Dinsmore & Shohl, LLP

COUNSEL FOR APPELLEE: Randolph H. Freking, Kelly Mulloy Myers, Freking & Betz, LLC

COUNSEL FOR AMICUS CURIAE EASTERN KENTUCKY UNIVERSITY: Laurie Aleta Carter

COUNSEL FOR AMICUS CURIAE KENTUCKY COMMUNITY AND TECHNICAL COLLEGE SYSTEM: James C. Cantrill III

COUNSEL FOR AMICUS CURIAE KENTUCKY STATE UNIVERSITY: Lori Anne Davis

COUNSEL FOR AMICUS CURIAE THE UNIVERSITY OF LOUISVILLE: Dana B. Mayton, Amy Elizabeth Shoemaker

COUNSEL FOR AMICUS CURIAE MOREHEAD STATE UNIVERSITY: Freddi J. Vescio Fitzpatrick

COUNSEL FOR AMICUS CURIAE MURRAY STATE UNIVERSITY: John Patton Rall

COUNSEL FOR AMICUS CURIAE WESTERN KENTUCKY UNIVERSITY: Deborah Tomes Wilkins

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

Andrea Weickgenannt is a former Northern Kentucky University faculty member who filed a claim for gender discrimination under the Kentucky Civil Rights Act after she was denied tenure in 2007. The trial court granted summary judgment in favor of the university, ruling that Weickgenannt failed to state a prima facie claim for gender discrimination because she could not prove she was qualified for tenure and she could offer no proof of similarly situated male comparators. The Court of Appeals reversed the trial court's summary judgment. On discretionary review, we reverse the holding of the Court of Appeals because we conclude it employed an incorrect standard of review for identifying similarly situated males. We reinstate the trial court's summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Weickgenannt is a Certified Public Accountant who was employed by the Northern Kentucky University College of Business from 2000–2009. She joined the university initially as an Instructor but after two years was offered a tenure-track position as an Assistant Professor in the Accountancy Department. Her work over the next six years formed the basis for the university's decision whether or not to grant her tenure. A series of complex considerations and procedures guided the university in making its choice on whether to grant her promotion as a tenured professor.

In the six years leading up to her application for tenure, Weickgenannt was employed on a reappointment basis, which meant that her performance was reviewed annually by a committee evaluating her entire academic record. Specifically, the committee looks at a tenure-track Assistant Professor's (1) teaching effectiveness; (2) scholarly and creative activity; and (3) institutional and public service. Consequently, the committee makes recommendations to the tenure-track candidate on his or her progress and offers counsel in areas of improvement for the coming year in addition to recommending whether the faculty member should be reappointed for another year. After five years of renewable, probationary contracts, an Assistant Professor must apply for promotion and tenure the following year. If the applicant is unsuccessful, the applicant is issued a terminal contract for the ensuing academic year and is no longer eligible for promotion and tenure. With regard to decision-making authority, the Faculty Handbook states that "decisions regarding the value, appropriateness, and prioritization of faculty activities must be made by the department in which the faculty member resides, the Dean of the College, and the Provost."

Weickgenannt was reappointed in each of the five years leading up to her application for promotion. She emphasizes her excellence in teaching during this period. And to be sure, students endorsed her teaching ability by voting her Outstanding Accounting Professor. But the reappointment committee also noted some troublesome aspects in the run-up to her tenure application. In fact, the committee warned Weickgenannt in three separate years that her scholarly activity was insufficient and admonished her that "continued

emphasis on journal publication should be paramount in [her] plans for the upcoming years." The committee was concerned she was not producing enough academic output to put forth a strong application for tenure.

After her sixth year as an Assistant Professor at NKU, Weickgenannt applied for promotion and tenure. She was the only female accounting professor considered by the university in 15 years and the only applicant from that department that year. The NKU Faculty Policies & Procedures outline the basic considerations for reviewing tenure applications, but colleges within the university were free to supplement those criteria as deemed appropriate. It should be noted that at the time she sought promotion, Weickgenannt did not have a doctorate or terminal degree in Accountancy, an achievement many colleges and universities desire when hiring tenured professors. Lacking a doctorate or terminal degree, much of her application would further rely on her scholarly contributions and other aspects of her performance as an Assistant Professor.

NKU tenure guidelines require applicants to show excellence in teaching, scholarship, and community involvement, the same three areas the reappointment committee evaluated during the probationary period. But the NKU College of Business sets forth specific scholarship guidelines. To have tenure-worthy scholarship, an applicant's portfolio should include: (1) ten total works in publicly available academic or professional outlets; (2) three of which must be peer-reviewed academic journal articles of good quality; and (3) the appli-

cant should display an indication of continuing scholarship. The tenure candidate bears the burden of proof in establishing the capacity and commitment to a lifetime of scholarly activity. Weickgenannt, complying with NKU's policy, included three published peer-reviewed journal articles in the portfolio she submitted to the tenure committee.[1] The articles she submitted included:

- *Auditor's Self Perceived Abilities in Conducting Domain Audits Critical Perspectives on Accounting* (with V. Owhoso)
- *Spatelli's Pizzeria: Management of Accounting Information Systems, The Journal of Accounting Case Research* (with P. Theuri and L. Turner)
- *Emphasis on the Statement of Cash Flows in Introductory Financial Accounting Courses: Its Effect on Student Perceptions, The National Accounting Journal* (with P. Theuri and L. Turner)

These pieces ignited significant controversy in the ensuing tenure-review process for a number of reasons but primarily because Weickgenannt was not the sole contributor in any of the articles and the quality and extent of her scholarship suspect.

The first step in the process was review by the Accountancy Department Committee and the Chair of the Accountancy Department, Dr. Leslie Turner. Many members of the committee were the same faculty members involved in Weickgenannt's reappointment process over the preceding six years. So the committee was well-aware of the potential scholar-

---

1. She also claims she had several pieces that were completed but awaiting publication in the near future. Weickgenannt suggests there is an informal practice at NKU in which applicants are allowed to include these pieces in their portfolios and some candidates have been given the benefit of the doubt. And she provides some anecdotal evidence that this has indeed happened. But because the express guidelines that governed both NKU and Weickgenannt in this process make no such reference, we will only consider the three articles submitted with her portfolio.

ship issues documented in her record. Nevertheless, both the committee and Dr. Turner recommended granting Weickgenannt's application for promotion and tenure. But this recommendation was subject to approval from the NKU's Dean of the College of Business and the Provost.

John Beehler had only been Dean of the College of Business for a few months when Weickgenannt applied for tenure. In fact, her application was the first tenure review he conducted as Dean. He took particular interest in her application because of her status as a "borderline" case and conducted a thorough review of her portfolio. An accountancy academic himself, Beehler is familiar with exceptional accounting scholarship and recognizes high-quality academic publications. He had never heard of *The National Accounting Journal* and decided to evaluate its academic value. He ultimately concluded that the journal did not amount to "good quality." His critique of *The National Accounting Journal* in addition to his finding that Weickgenannt lacked a "continuing commitment to do scholarly activity in the future" provoked his final decision to deny tenure.

Following Beehler's assessment of her application, he offered his recommendation to NKU Provost Gail Wells. After a "cover-to-cover" review of Weickgenannt's portfolio, Provost Wells concurred with Beehler's recommendation. There appear to be three bases for this decision. First, Provost Wells spoke to faculty members of Western Kentucky University, Eastern Kentucky University, and Kent State University about the quality of *The National Accounting Journal.* All faculty members asked responded that an article in this publication would be of insufficient quality to merit tenure. Second, Provost Wells became concerned that Weickgenannt's first article, *Auditor's Self Perceived Abilities in Conducting Domain Audits,* was

substantially similar to an article written by faculty member Vincent Owhoso (Weickgenannt's co-author) the previous year. Provost Wells therefore discounted Weickgenannt's contribution to the article and did not consider her a major contributing author because of the papers' similarities in methodology, hypothesis, and statistical analysis. And finally, Wells formed her decision to deny tenure because of Weickgenannt's inability to be the lead author of any of her presented publications. Indeed, Provost Wells invoked the warnings Weickgenannt received over the prior six years and stated, "Now the time was up, and she had never demonstrated that she could be a lead author on a piece."

The NKU Faculty Policies & Procedures allow a tenure candidate to appeal the Provost's recommendation to a Peer Review Hearing Committee (PRHC). This group consists of five faculty members from five different colleges within NKU that conducted a quasi-fact-finding hearing on Weickgenannt's situation. The PRHC ultimately disagreed with the decision to deny tenure on the basis of "good quality" scholarship; it also stated it could not definitively assess Weickgenannt's scholarship contributions or whether she made meaningful changes to Owhoso's article. These findings were formalized in a recommendation to NKU President James Votruba, who would propose a final recommendation to the Board of Regents. It is important to note that Weickgenannt raised no allegations to the PRHC of gender discrimination by either Dean Beehler or Provost Wells.

Despite the PRHC findings, President Votruba ultimately recommended that the Board of Regents should deny Weickgenannt's application for tenure—which it did. Votruba conducted his own thorough investigation into her portfolio. NKU facul-

ty guidelines allow the university president to consult with the provost and college dean before making a final determination. He asked Dean Beehler and Provost Wells to explain the basis in their disagreements with both the Accountancy Department and the PRHC. President Votruba concluded that Weickgenannt did not satisfy the scholarship requirements prerequisite for tenure, and moved the Board of Regents to reject her application. She was issued a terminal contract for the ensuing academic year.

With her internal appeals exhausted, Weickgenannt filed suit in circuit court in March 2009, alleging breach of contract and violations of the Kentucky Civil Rights Act (KCRA) for discriminatory employment practices on the basis of her gender.[2] The trial court granted NKU summary judgment in October 2011, agreeing with the university that Weickgenannt failed to establish a prima facie gender-discrimination claim. The court particularly held that she had not established she was qualified for tenure and she failed to present evidence she was treated differently from similarly situated male tenure candidates. Going further, the trial court found that even if she could raise a prima facie claim, she failed to show the stated reason NKU presented in support of its decision to deny tenure (inadequate scholarship) was a mere pretext for discrimination.

A panel of the Kentucky Court of Appeals reversed the trial court's issuance of summary judgment. The panel rejected the trial court's prima facie analysis, holding that the trial court applied a more rigid evaluation than necessary to state a claim. As for the remainder of the discrimination analysis, the panel agreed that NKU's contention that Weickgenannt was not qualified was indeed a legitimate, nondiscriminatory reason for not offering her tenure. But the panel also concluded that Weickgenannt successfully offered evidence of similarly situated male faculty members who were promoted within the College of Business around the time of her application. To the panel, this was enough to show that NKU's nondiscriminatory reason was pretext for discrimination—at least enough to survive summary judgment.

NKU appealed to this Court, and we granted discretionary review to determine whether the Court of Appeals erred in its reversal of summary judgment. Because we agree with the trial court that Weickgenannt failed to state a prima facie gender-discrimination claim, we reverse the Court of Appeals and reinstate the trial court's summary judgment.

## II. ANALYSIS.

### A. Standard of Review.

In 1966, the General Assembly passed the KCRA to place the Commonwealth on par with the protections guaranteed in the Federal Civil Rights Act of 1964.[3] The general purpose of the KCRA is to "safeguard all individuals within the state from discrimination because of the person's familial status, race, color, religion, national

---

**2.** Her contractual claims were dismissed without prejudice and later re-filed in Franklin Circuit Court. Those claims would ultimately be dismissed on sovereign immunity grounds. So her KCRA claims are the only issues before this Court.

**3.** Kentucky Revised Statutes (KRS) 344.020(1). The Act has been subsequently amended, with stated purposes designed to also execute Title VIII of the Federal Civil Rights Act of 1968, the Fair Housing Act, the Federal Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, and the Civil Rights Act of 1991. *See id.*

origin, *sex*, age forty (40) and over, or because of the person's status as a qualified individual with a disability."[4] Accordingly, it is an unlawful employment practice to "fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges because of the individual's sex."[5] Weickgenannt rests her claim on this statute. She specifically contends that NKU denied her a tenured professorship because she is a woman.

Because of its similarity to federal civil-rights legislation, the KCRA tracks federal case law for guidance on claims based on gender discrimination.[6] In *McDonnell Douglas Corp. v. Green*, the United States Supreme Court outlined the burden-shifting test reviewing courts should employ in discrimination actions against a private employer.[7] Under a modified version of that framework, Weickgenannt first bears the burden of establishing a prima facie discrimination action, which includes proof that: (1) she was a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated males were treated more favorably.[8] If Weickgenannt can maintain a prima facie claim, the burden then shifts to NKU to offer a "legitimate, nondiscriminatory reason" for denying her tenure.[9] The burden then shifts a final time, where Weickgenannt must then be afforded a "fair opportunity" to show that NKU's stated reason for denying tenure was "in fact pretext" for discrimination.[10]

The trial court granted summary judgment to NKU by concluding that Weickgenannt failed to state a prima facie claim because she could not identify any similarly situated male candidates who were granted tenure. The trial court went further and ruled that even if she could raise a prima facie inference of discrimination, she had no evidence that NKU's stated reason for denying her application (inadequate scholarship) was pretext for discriminating against her because she is a woman. In reversing, the Court of Appeals criticized the trial court for applying a "similarly-situated" standard that is overly narrow, and held that Weickgenannt proved more than enough for her claim to survive summary judgment.

On summary judgment review, the appropriate standard for our analysis is "whether the record, when examined in its entirety, shows there is 'no genuine issue as to any material fact and the mov-

---

4. *Id.* (emphasis added).

5. KRS 344.040(1).

6. *See Com., Alcoholic Beverage Control Bd. v. Burke*, 481 S.W.2d 52 (Ky. 1972). *See also Gibson v. Finish Line, Inc. of Delaware*, 261 F.Supp.2d 785, 789–90 (W.D.Ky. 2003) (To establish a KCRA violation, plaintiff must prove the same elements required for a prima facie discrimination claim under Title VII; therefore, Kentucky courts often look to interpretation of federal law for guidance in applying the KCRA).

7. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

8. *See id.* at 802, 93 S.Ct. 1817. *McDonnell Douglas* involved racial discrimination. The prima facie analysis stated above is adjusted to reflect a claim for gender discrimination. In *Commonwealth v. Solly*, 253 S.W.3d 537 (Ky.2008), this Court adopted this precise recitation of *McDonnell Douglas* for state civil rights claims based on gender discrimination. *Id.* at 541.

9. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

10. *Id.* at 804, 93 S.Ct. 1817.

ing party is entitled to a judgment as a matter of law.' "[11] The evidence must be viewed to the benefit of the nonmoving party with all ambiguities resolved in its favor.[12] In our review of the decisions below, we must "determine whether the trial court correctly found that there were no genuine issues of material fact."[13] We review the trial court's issuance of summary judgment de novo, and any factual findings will be upheld if supported by substantial evidence and not clearly erroneous.[14]

## B. The Court of Appeals Misstated the "Similarly Situated" Component of the *McDonnell Douglas* Test.

As its central reason for granting NKU summary judgment, the trial court determined that Weickgenannt failed to offer any evidence of similarly situated male candidates who were given tenure. In making this determination, the trial court employed a detailed, circumstantial criterion for who would qualify as "similarly situated." The trial court first looked for male comparators that were from the same department, judged by the same criteria, and reviewed within the same relative period of time by the same individuals Weickgenannt claims treated her unfairly—Dean Beehler, Provost Wells, and President Votruba. Then specifically to her situation, the court sought comparators of similar qualifications—a minimal number of peer-reviewed articles, nominal contributions to jointly written articles, or publication in a journal considered inferior in its scholarly contribution. The trial court rejected Weickgenannt's prima facie

claim because it concluded that no such person existed.

The Court of Appeals found this standard overly burdensome for a plaintiff to establish as a prima facie claim. The panel disapproved of the trial court's inquiry into the treatment of similarly situated male employees during the prima facie stage of the action. To the Court of Appeals, the final prong of the *McDonnell Douglas* test is satisfied by simply showing "whether someone outside the protected class, *i.e.*, a male faculty member, had received the promotion or benefit Weickgenannt had sought and been denied." The appellate court determined Weickgenannt met this burden simply by showing any male candidate received tenure during the relative period of her candidacy.

In reaching this conclusion, the Court of Appeals held that an analysis of whether those male faculty members were indeed similarly situated is only appropriate during the last step of the burden-shifting test: to establish whether NKU's scholarship justification was merely pretext for discrimination. The panel declared that a legal analysis of this proof is not fit for the threshold prima-facie pleading. Under this rationale, the Court of Appeals determined that Weickgenannt's claim was inappropriate for summary judgment.

But the panel's approach neglects the point that the *McDonnell Douglas* test means what it says. The *McDonnell Douglas* framework we adopted within the gender-discrimination context directs plaintiffs to show *similarly situated* male comparators, an evidentiary burden be-

---

11. *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky.2010) (quoting CR 56.03).

12. *Id.*

13. *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009).

14. *See Energy Home Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828 (Ky. 2013).

yond proof of male promotions. To establish a prima facie claim, a plaintiff bears the burden of not only establishing that a male candidate received tenure but also that candidate was reviewed under the same circumstances and with similar qualifications. To state a claim, one must at least raise the inference that employment decisions were made on a discriminatory basis.[15] And drawing that inference mandates more proof than anecdote.[16] So we must accordingly outline the proper judicial criteria for seeking an adequate similarly situated male comparator seeking promotion and tenure from NKU.

 In identifying suitable comparators, we must select individuals who are "similarly situated in all relevant aspects."[17] Indeed, Weickgenannt must present evidence that "all relevant aspects of [her] employment situation are nearly identical to those of the employees who [s]he alleges were treated more favorably."[18] To us, the appropriate standard in our search for comparators should be bifurcated: a comparator must be both of similar qualification to Weickgenannt and must have been subject to the same reviewers and application process at or about the same time.

Particular to this case, the first subset of this analysis requires us to inquire into Weickgenannt's curriculum vitae and her subjective qualifications for tenure. A similarly situated male comparator should present a similar record: the NKU guide-

minimum three peer-reviewed publications, zero sole authorships, and publication in a journal of less-than-acceptable quality. Additionally, because Weickgenannt did not have a doctorate nor a terminal degree in Accountancy, a comparator should have a similar level of academic achievement.

Beyond scholarly contributions, our analysis requires temporal proximity and review subject to the same processes and by substantially similar. This is of particular interest because, as referenced above, College of Business Dean Beehler had only held his post for a short time when he reviewed Weickgenannt's application. Beehler and Provost Wells were at the center of the decision to deny her tenure, so any male comparator needs to have undergone their scrutiny.

We examined all of Weickgenannt's potential comparators under this standard.

## C. Employing the Correct *McDonnell Douglas* Analysis, Weickgenannt Failed to State a Prima Facie Claim.

 Weickgenannt offers a host of male candidates that applied for tenure in the years surrounding her application that she considers similarly situated. The Court of Appeals identified one individual, Richard Gilson, as an adequate comparator for purposes of this analysis. We did not limit our review to Gilson, but we agree with the appellate panel that he is the best

---

**15.** *See Shah v. General Elec. Co.,* 816 F.2d 264, 268 (6th Cir.1987) ("the central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference of discrimination").

**16.** *See id.* ("individual disparate impact cases ... generally require indirect evidence from which an inference of discriminatory motive may be drawn, namely, comparative evidence

demonstrating that the treatment of the plaintiff differs from that accorded to otherwise similarly situated individuals who are not within the plaintiff's protected group").

**17.** *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998).

**18.** *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994).

representative Weickgenannt could proffer. Ultimately, for reasons stated below, Weickgenannt failed to present a male faculty member who was granted tenure with similar qualifications and subject to the same review procedures.

Gilson is a management instructor who applied for tenure one year *before* Weickgenannt. The Court of Appeals accepted him as an adequate comparator because of this temporal proximity to Weickgenannt's application and also the fact that his portfolio also included only three scholarly articles published in peer-reviewed journals, with all publications being co-authored.[19] The fact that Gilson was granted tenure while Weickgenannt was not was enough for the Court of Appeals to support her contention that she was treated unfavorably in light of similarly-situated male faculty members. We disagree.

First and foremost, Gilson held a doctorate at the time of his application for promotion—a level of academic achievement Weickgenannt had not attained. So he was arguably more qualified than Weickgenannt, at least at the time of their applications for tenure. Second, his scholarly contributions were not considered suspect, and his three peer-reviewed publications were published in what NKU considered quality journals. NKU is certainly free to distinguish precisely what type of scholarship it considers exceptional.[20] And under its standards, Gilson's scholarship did not provoke as much objective criticism as Weickgenannt's contributions.

But perhaps most importantly, Gilson was not promoted to tenure under Dean Beehler's discerning eye. NKU urges us to note other procedural discrepancies between Weickgenannt and Gilson—such as the fact that he was promoted from a different department or subject to a different tenure committee and department chair. While those concerns hold merit, we do not consider them dispositive; Weickgenannt and Gilson were both subject to the same tenure standards under the College of Business umbrella. And both Gilson and Weickgenannt were recommended for tenure from their respective departments.

The critical difference that bars Gilson from being an adequate comparator is Beehler's presence. Beehler assumed his duties as Dean of the College of Business *after* Gilson was awarded tenure. He was the prime mover in denying Weickgenannt's application. Because Gilson was not subject to this review, we cannot say he could possibly be a "similarly situated" comparator.

Other male faculty members Weickgenannt presents fall short of being similarly situated for similar reasons—either their subjective qualifications do not closely resemble Weickgenannt's, their applications for tenure were reviewed by persons other than Dean Beehler and Provost Wells, or they hailed from dissimilar practice areas. So we must ultimately conclude that Weickgenannt failed to offer any similarly situated comparators and, accordingly, failed to present a prima facie gender dis-

19. The Court of Appeals panel conducted this discussion during the final step of the gender discrimination analysis—determining whether NKU's legitimate reason was pretext to discriminate—and not as part of the fourth prong of proving a prima facie case. Nevertheless, the inquiry is identical, and we consider this to be the panel's opinion on whether adequate comparators existed.

20. *See Waggaman v. Villanova*, No. 04-4447, 2008 WL 4091015, *10, 2008 U.S. Dist. LEXIS 67245, *37–38 (D.D.C. Sept. 4, 2008) ("The university is entitled to decide what journals are considered sufficient in quality to count as refereed journals.").

crimination claim under the adjusted *McDonnell Douglas* framework.

Because Weickgenannt cannot state a claim for gender discrimination under the KCRA, we must reverse the Court of Appeals' decision and reinstate the trial court's summary judgment. Based on information brought before us on review, we see no indications of intentional gender discrimination influencing NKU's tenure decisions. We note that the only allegations of this supposedly systematic discrimination against would-be female professors are voiced for the first time in Weickgenannt's trial-court complaint. We also note the irony in the fact that one of Weickgenannt's alleged primary discriminators is itself evidence that NKU harbors no ill-will toward exceptional female scholars. She simultaneously asks us to believe NKU fails to promote women while Provost Wells—a female professor promoted to the second-highest position of authority within the university, vocally opposed her application.

More realistically, this case has more to do with a newly hired dean seeking to impose his own mark on the College of Business's tenure standards than any invidious discrimination the KCRA so strongly prohibits. Dean Beehler is an accountancy academic and Weickgenannt was the first application he reviewed. The decision to offer tenure to a faculty member is a delicate one and one often made with the utmost care and deliberation. It is not difficult for us to imagine that Beehler's critical standards were simply more demanding than those employed by prior College of Business deans.

We think the 2007 academic year represented more a shift in NKU's scholarly contributions prerequisite to entry into the academy than any attempt to exclude females from its ranks. This is bolstered both by Weickgenannt's failure to raise the issue of gender discrimination at any point in the internal review and appeal process and with the College of Business's subsequent record of granting tenure to female candidates in the years following Weickgenannt's rejection.

## III. CONCLUSION.

Because Weickgenannt failed to present evidence of similarly situated male comparators, she is unable to raise a prima facie claim for gender discrimination. The Court of Appeals employed an erroneous standard for reviewing her claim, so we reverse its holding. Applying the correct standard, NKU is entitled to summary judgment, and we thereby reinstate the trial court's ruling.

All sitting. All concur.