RENDERED: JANUARY 27, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1539-MR

STEPHANIE HUTCHISON, M.D.                                    APPELLANT

v.                APPEAL FROM BOYD CIRCUIT COURT
                  HONORABLE GEORGE DAVIS, JUDGE
                  ACTION NO. 16-CI-00377

KING'S DAUGHTERS MEDICAL
SPECIALISTS, INC.                                            APPELLEE

OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE: ACREE, DIXON, AND K. THOMPSON,[1] JUDGES.

THOMPSON, K., JUDGE: Stephanie Hutchison, M.D., appeals from the

summary judgment granted in favor of King's Daughters Medical Specialists, Inc.

(KDMS) on a breach of contract action which also dismissed her claims of

---

[1] Judge Kelly Thompson authored this Opinion before his tenure with the Kentucky Court of Appeals expired on December 31, 2022. Release of this Opinion was delayed by administrative handling.

discrimination, retaliation, fraud, and intentional infliction of emotional distress (IIED). Dr. Hutchison was not able to establish that any factual issues remain on her counterclaims except as to breach of contract regarding whether KDMS's actions improperly shut down her practice during the contractually obligated ninety-day notice period between when she was informed of the decision to terminate her employment and when the termination took effect. Therefore, we affirm the dismissal of Dr. Hutchison's other claims, but reverse the grant of summary judgment in KDMS's favor on the breach of contract claim and remand as factual issues remain on the narrow issue of whether KDMS thereby violated the contract and damaged Dr. Hutchison.

## FACTUAL AND LEGAL BACKGROUND

Dr. Hutchison is an obstetrician/gynecologist (OB/GYN) who worked for KDMS for approximately twenty-one months, from September 19, 2011, until June 7, 2013. Previous to this employment, Dr. Hutchison worked with Dr. Kelsey James from July 2010 until August 2011. Dr. James was not an employee of KDMS. During this time, Dr. Hutchison obtained privileges at King's Daughters Medical Center (KDMC) and performed surgeries there.

## I. The Agreement

On September 19, 2011, Dr. Hutchison entered into a Physician Employment Agreement (the Agreement) with KDMS. Dr. Hutchison continued to have a Wednesday block surgery schedule in operating room 8 (OR 8).

The Agreement specified in relevant part that KDMS is a controlled subordinate organization of KDMC (also referred to as the hospital). Dr. Hutchison agreed to work as a full time OB/GYN for KDMS, which made her the only OB/GYN employed by KDMS at this time. Dr. Hutchison specifically agreed to provide "professional Obstetrics and Gynecology Services and related services to the patients of KDMS" and "on call services and call coverage for the practice and the Hospital[.]" She also agreed that she "shall not during the Term seek medical staff privileges at any other hospital without KDMS' prior written consent, which may be granted or withheld in KDMS' sole discretion."

KDMS's duties to Dr. Hutchison included that "KDMS will provide appropriate space, staffing, equipment, supplies, furnishings and other resources ("Resources") at levels necessary, in KDMS' reasonable discretion, to operate an Obstetrics/Gynecology practice." KDMS was also required to provide Dr. Hutchison with a salary as set out in Exhibit A, to "use its best efforts to market Physician's medical practice," and to "bill and collect all fees for Physician's services provided under this Agreement" with "Physician agree[ing] to work with

KDMS' staff to bill all patients and/or third parties promptly for services rendered and to use her best efforts to help KDMS to collect all patient accounts." The Agreement provided that "KDMS, or a third party acting on KDMS' behalf, shall bill and collect all charges or fees for Physician's services provided under this agreement and such charges or fees shall be the sole and exclusive property of KDMS." KDMS was responsible to "use its best efforts to provide Obstetrics/Gynecology coding education for its billing staff and Physician's office staff (as requested), within thirty (30) days of the execution of this agreement."

As to the effective term of the Agreement, it provided that "[u]nless otherwise terminated as provided herein, this Agreement shall be for a term of three (3) years commencing on September 19, 2011 and terminating on September 18, 2014 (the "Term")." The Agreement provided three ways that it could be terminated early: (1) termination by KDMS for cause; (2) termination by Dr. Hutchison for cause; and (3) termination without cause by either party. As to this third option, other than a heading it only specifies: "Either party may terminate this Agreement without cause, upon ninety (90) days notice to the other party."

Exhibit A regarding compensation calculated Dr. Hutchison's total annual compensation as follows:

Total compensation shall mean:

[1]     Physician's Professional Fees collected during the
        applicable measurement period,

-4-

minus

[2]    Physician's Direct Expenses[2] paid during the applicable measurement period,

minus

[3]    Physician's Allocable Share of all General Expenses[3] paid during the applicable measurement period.

Exhibit A explained that during the first year of the Agreement (the twelve month period following the start date of the contract) Dr. Hutchison would be paid a bi-weekly draw equal to $5,128.49.[4]  Amounts for future draws were subject to further adjustment, but it was provided that "the amount of the Bi-Weekly draw may be reduced upon request by Physician from time to time, and may be increased upon request by Physician from time to time if such increase is supported by collections of Physician's Professional Fees."  Further adjustments

---

[2] "Direct expenses" were defined as "those direct expenses of the Practice that are paid during the applicable measurement period and allocable to a physician in the Practice (including Physician)[.]"  They included things like malpractice insurance, licensure fees, salaries and benefits of any employed nurse directly supporting that physician, and other expenses "within the four walls" of the Practice site directly allocable to that physician.

[3] "General expenses" were defined as meaning "all expenses of the Practice allocable to the Practice paid during the applicable measurement period . . . that do not constitute Direct Expenses that are allocable to any physician in the Practice (including Physician)" and included things such as "salaries and benefits of any support staff" that did not constitute direct expenses, office supplies, occupancy expenses, general utilities, medical supplies, and payroll taxes.

[4] This draw was contingent upon a second practitioner sharing space with Dr. Hutchison and if that did not occur "the Bi-Weekly Draw amount is subject to immediate adjustment by KDMS." However, although another practitioner never shared her space, Dr. Hutchison's initial draw was never reduced.

-5-

were to be made depending upon actual revenues and actual payouts would be made to Dr. Hutchison if her revenues exceeded her draws or her draws would be decreased if revenues were too low.[5]

Exhibit A further stated that if Dr. Hutchison's employment terminated for any reason how compensation would be paid out and what would occur if she owed KDMS for draws after the end of the quarter in the year in which employment terminated, providing:

> If Physician's compensation for such quarter . . . is less than the sum of the amounts already paid to Physician for such quarter . . . then Physician shall repay such difference to KDMS within ten days after KDMS notifies Physician in writing of its determination of the amount to be repaid by Physician to KDMS[.]

---

[5] Draw amounts were to be adjusted within forty-five days after the end of each quarter to provide a quarterly settlement based on estimates of the actual revenues that would be collected for professional services each quarter based on billings multiplied by a collection rate of 50% and the physician's share of actual expenses. If this amount was in excess of the bi-weekly draws, the physician would receive the excess, with additional adjustment 120 days after the end of the first year based on "actual revenues collected during the First Year and within three months thereafter from services performed during the first year as well as expenses paid during the First Year."

Then after the first year, at the end of each quarter, compensation was to be "calculated based on the actual revenues collected and expenses paid during such quarter, and not on revenues collected or expenses paid before or after such quarter." It was specified that KDMS would pay out compensation exceeding the draws within thirty days after each quarter, and "to the extent Physician's Quarterly Compensation for the quarter is less than the sum of the Bi-Weekly Draws paid to Physician for such quarter, then the difference will be deducted from the calculation of Physician's Quarterly Compensation for the next quarter and each quarter thereafter until the full amount of such difference has been repaid by Physician to KDMS." KDMS had the option to, after two quarters of this, reduce the physician's biweekly draw to avoid future repetition of this problem.

## II. Staffing Issues

Dr. Hutchison was unhappy with the staff she was given to run her practice and wanted to share space and work with an OB/GYN nurse practitioner. Dr. Hutchison testified in her deposition that her staff's prior experience was extremely limited, and she did not believe her staff had appropriate training to work in OB/GYN or to bill for her services, and the thirty days of training specified in the Agreement were never provided. She alleged she was forced to pay salaries for incompetent staff who were not permanent staff, with staff not filling out patient consent forms required to be completed thirty days before surgery for preauthorization to collect from Medicaid patients, and then having the forms filled out incorrectly and having to be done a second time. She reported that KDMS staff told her that the preauthorizations were not done and that billings were not being made for ultrasounds and other in-office services. She further testified that her licensed practical nurse (LPN), who did not have training in obstetrics and gynecology, was emailing her rather than contacting her directly about "pregnant patients being seen at urgent care with blood pressures 140s over 90s, which could have been a stroke."

## III. The Robots

While working with Dr. James in 2010-2011, Dr. Hutchison used KDMC's one da Vinci S Robot (S Robot) to perform robotic surgeries. The S

Robot was located in KDMC's OR 8, and Dr. Hutchison had a Wednesday block surgery schedule in OR 8. She, thus, had unlimited access to the S Robot for her surgery schedule.

In March 2012, KDMC purchased a second robot, the da Vinci Si Robot (Si Robot). The Si Robot was a newer model which included advanced features. KDMC purchased the Si Robot with federal funds for cancer surgeries for single incision procedures. KMDC promoted that Dr. Eric Smith, a general surgeon, could perform single incision laparoscopic surgeries with the Si Robot, and that the OB/GYNs with privileges at KDMC could also perform minimally invasive surgeries using it.

The S Robot was moved to operating room seven (OR 7) and Dr. Hutchison's Wednesday block schedule was moved to OR 7. The Si Robot was placed in OR 8 and was available to all physicians but was not subject to being reserved through block scheduling. Instead, all the physicians were supposed to be given access to the Si Robot on their assigned surgery days based on the need and complexity of each procedure. Dr. Smith had Monday and Wednesday surgery days, Dr. Hutchison had Wednesday surgery days, and other OB/GYNs had

Tuesday and Thursday surgical days. According to Dr. Hutchison, there was a lot more demand for the Si Robot, because it was a superior machine.[6]

When there were competing requests for access to the Si Robot, KDMC's robotic team lead, Chrystal Lemaster, decided which procedure took priority based on the complexity and expected duration of the procedure. When a physician could not have access to the Si Robot, the S Robot continued to be available for their use in OR 7. Dr. Hutchison began complaining that Dr. Smith was performing some of his surgeries on Wednesdays which interfered with her access to the Si Robot on Wednesdays.

Dr. Hutchison testified she was unhappy with the amount of surgery time she was getting in general and with the Si Robot in particular. She believed "the Boys" a group of male OB/GYN physicians with privileges at KDMC, did not want her competing with them for patients and conspired to deprive her of surgical

---

[6] Dr. Hutchison testified that she could perform certain surgeries better with the Si Robot and was on the cutting edge when it came to performing deep endometriosis resections which restored fertility. She explained that while the S Robot showed images in 2D, the Si Robot showed 3D high definition images, allowing her to remove more endometriosis rather than just what was visualized on the surface. She explained that the S Robot did not offer much of an advantage over a regular laparoscopic surgery (with someone else operating a camera) as she could not see any better with it, but it did allow her to always have the camera where she wanted it, and the S Robot caused less pain to patients because the robotic instruments could move more ways. Dr. Hutchison noted that she was one of three physicians that used the S Robot, with the other two also being OB/GYNs (Dr. James and Dr. Brian Frederick), while other physicians, like Dr. Smith, did not bother to use the S Robot for laparoscopic surgeries. However, the other physicians saw the advantages offered by the Si Robot and used it. She explained that when only the S Robot was available, she was performing 75% of all robotic surgeries.

time and KDMC staff assisted them with this goal.[7] Dr. Hutchison claimed that as a result of having less surgical time, she was running three months behind in her surgical schedule, which resulted in her losing patients to other physicians.

During the rest of 2012, Dr. Hutchison continued to complain about her access to the Si Robot. In text messages sent in November 2012, she

_____

[7] Dr. Hutchison specifically testified that the OR schedules submitted as exhibits were inaccurate and that the other surgeons ended up getting two ORs at once, so they could flip back and forth between surgeries and perform more surgeries, with male surgeons getting more operating rooms than female surgeons, with the schedule continually being changed. Dr. Hutchison testified that initially she was supposed to get the Si Robot on all Wednesdays, then she was supposed to get it on alternating Wednesdays with Dr. Smith, but then her reserved days were taken away. She stated that if surgeries were not scheduled at least three days in advance, reserved days could be taken away but said that this rule did not apply when Dr. Smith scheduled surgeries at the last minute, with her having to give way instead, and that the male surgeons were given preference over the female surgeons, with the female surgeons getting their surgeries bumped (not just Si Robot surgeries) while the male surgeons did not. She also complained that she lost access to outpatient surgery and was not given the NovaSure and other equipment needed because male surgeons got preference. While Dr. Hutchison acknowledged performing surgeries on the Si Robot in late 2012, she was not sure if she performed any surgeries with it in 2013. "It was a concerted effort. They took all my surgery away." She testified to asking to have her block time moved to a different day than those assigned to Dr. Smith or Dr. Frederick because those were the surgeons who got her time, but that her request was refused. She testified she believed Dr. Smith was receiving preferential treatment from Lemaster regarding scheduling beginning in September 2012, due to them having an affair, and that he was actually purposefully scheduling single-port surgeries for which he wanted the Si Robot for Wednesdays rather than Mondays. She also testified that the three other male gynecologists were making up false accusations against her, with Dr. Ford calling Dr. Fioret and telling him she had abandoned a patient, which was untrue, and Dr. Fioret told her "the boys want you gone," referring to Dr. Frederick, Dr. Ford, and Dr. Dotson (who shared office space together). She explained that she was told by Dr. James before she started with him that they did not want a "white homegirl" practicing there because they did not want the competition and would not even say "hi" to her the first four months she was there. She stated that Dr. James and Dr. Fioret referred to them as "the boys" and they were referred to by others that way when discussions were made regarding covering vacations and on-call. Dr. Hutchison stated she discussed with other female doctors how they were all subject to sexual discrimination, with Dr. Katrina Briggs agreeing that the OR schedules were not fair, and Dr. Navita Modi complaining about her time with the Si Robot being limited because Dr. Boykin apparently told Dr. Modi "it was a man's world."

-10-

complained that Lemaster and Dr. Smith were conspiring to limit her access to the Si Robot on her scheduled days and that robotic team members assigned for her robotic-assisted surgeries were less experienced. Dr. Hutchison explained in her deposition that this was an ongoing issue and not having more experienced team members in each robot room was problematic as they could not troubleshoot the robots, which led to delays mid-surgery which was dangerous for patients, and that she simply wanted equally experienced team members divided up between the ORs equipped with robotics.

Because Dr. Hutchison was not satisfied with the amount of time she was getting with the Si Robot at KDMC, in late 2012 she began pursuing obtaining privileges at Our Lady of Bellefonte Hospital (OLBH) and began performing surgeries there in January 2013. Although it was a breach of her contract for Dr. Hutchison to obtain privileges at another hospital without getting KDMS's prior permission and it appears that Dr. Hutchison did not ask before pursuing privileges there, Dr. Hutchison and Sara Marks (KDMS's Executive Director of Integrated Services at the time Dr. Hutchison worked for KDMS) both stated in their depositions that KDMS did not object to Dr. Hutchison obtaining privileges at

OLBH or performing robotic-assisted surgeries there on OLBH's Si Robot as KDMS was still receiving Dr. Hutchison's surgical fees.[8]

On January 8, 2013, Dr. Hutchison complained in a text message that all of her surgeries scheduled for the next day, a Wednesday, had been moved to the S Robot so that Dr. Smith could have the Si Robot. However, surgery records demonstrate that Dr. Hutchison performed four procedures in operating OR 8 with the Si Robot on that day.

Dr. Hutchison testified she believed she was being retaliated against when she made complaints about patient safety with her staff being untrained and there being insufficient experienced robot staff during surgeries as her access to the Si Robot was further limited as 2012 went on. However, according to the affidavit of Deanna Milum (KDMC's Director of Surgical Services who oversaw the scheduling of physicians in KDMC's operating rooms), which summarized surgical records, Dr. Hutchison continued to have more Si Robot surgeries than any other OB/GYNs through the end of 2012, and only general surgeon Dr. Smith had more Si Robot surgeries than she did overall.[9]

---

[8] Dr. Hutchison testified she continued to perform limited Si Robot surgeries at OLBH through the end of her contractual period with KDMS, with KDMS continuing to receive this income.

[9] Neither party discusses or documents how many surgeries Dr. Hutchison performed with the Si Robot at KDMC after January 9, 2013; this may be due in part to the fact that by this time Dr. Hutchison was conducting many such surgeries at OLBH.

## IV. Pay and Profitability

Pursuant to the Agreement with KDMS, Dr. Hutchison was originally paid a bi-weekly draw of $5,128.49 ($11,111.66 per month). However, given her initial profitability, and an excess payout of $68,610, Dr. Hutchison requested and was granted a draw totaling $25,000 a month beginning in May 2012.

After Dr. Hutchison's draws were increased, she began to have negative balances. As of June 30, 2012, the end of her third quarter, her total compensation had fallen below her draws by $2,723.

Despite having agreed to perform OB/GYN services and be on call, in May 2012, Dr. Hutchison texted her manager, Lydia Horn, that she had decided to stop seeing obstetrics patients. On July 3, 2012, she sent a letter to KDMC's medical executive committee asking to relinquish her call privileges for her OB practice. The committee granted her request effective August 1, 2012. After that time, she no longer saw obstetrics patients or provided call coverage for them.[10] While this was a breach of her contract with KDMS, it apparently accepted her decision and did not move to terminate the contract.

---

[10] Dr. Hutchison testified she stopped taking OB patients or providing call coverage for them as none of the other OB/GYNs provided any call coverage for her and she could not keep working eighty-hour weeks in which she had both office time and on-call time because it caused her health problems. Dr. Hutchison testified she wanted to work with a nurse practitioner but KDMS would not hire her, and she could have shared on-call coverage with her. Dr. Hutchison stated that after leaving KDMS she has practiced as an OB/GYN as she has been given appropriate call coverage.

By the end of September 2012, Dr. Hutchison's total compensation for the quarter was $32,845 less than her draws that KDMS had paid her. Dr. Hutchison continued to be "underwater" from October 2012 through April 2013, accumulating a balance due KDMS of $122,788 for those months. Between October 2011 and April 2013, she accumulated $198,069.30 in overpayments. However, KDMS failed to reduce her draws until March 2013, and did not collect for these losses out of her salary.[11]

Also in late 2012, Marks received complaints about Dr. Hutchison's unprofessional behavior from KDMC staff.[12] However, during this timeframe Dr. Hutchison also received a patient satisfaction award.

## V. Termination

On March 7, 2013, Marks sent Dr. Hutchison a letter on behalf of KDMS in which it exercised the option to terminate Dr. Hutchison's employment early. In the letter, Marks explained KDMS's decision as follows:

---

[11] No data about or claims regarding overpayments were made from the period after April 2013.

[12] In her deposition, Dr. Hutchison admitted to using some inappropriate language in conjunction with having a robot malfunction (cussing) and having insufficiently trained robot staff to troubleshoot, resulting in her going to the other OR and having to pull Lemaster in to try to correct the problem. Dr. Hutchison testified she was frustrated because Lemaster had previously changed her operating room and time and not supplied her with an adequate team, when Dr. Hutchison should have been allowed to use the original OR because the other doctor scheduled for it had not confirmed surgeries for that day three days in advance as required. However, Dr. Hutchison stated that Lemaster also acted unprofessionally and then made a complaint about her, when Dr. Hutchison argued she could have appropriately reported Lemaster because she was "very disrespectful and unprofessional."

-14-

As you know, King's Daughters Medical Specialties (KDMS) entered into an employment agreement with you on September 19, 2011 to provide obstetrics/gynecology services to KDMC and KDMS patients. Since that time, KDMS has worked with you to develop a successful obstetric/gynecology practice. However, a year and a half into the agreement it is clear that neither [of the] parties are satisfied with the current situation. As such, KDMS believes it is best if we part ways at this time. Please let this letter serve as KDMS' 90 day notice of termination of this agreement "Without" cause in accordance with Section VII (D) of the above reference[d] employment agreement.

According to Marks's deposition testimony, KDMS was unhappy with the relationship because of Dr. Hutchison's declining financial performance, complaints received about her behavior in the OR, Hutchison's apparent dissatisfaction with her operating room assignments and access to the Si Robot, and concerns about some of her cases.

Dr. Hutchison testified in her deposition that she believed her practice was shut down in retaliation for her complaining about sexual discrimination in being allowed to access the Si Robot, her surgeries being limited, and making complaints regarding patient safety relating to robot staffing, when she had a very successful practice of 3,000 to 4,000 patients. She also testified she believed her employment was terminated because she obtained privileges at OLBH.

Dr. Hutchison testified that the termination letter was essentially a closure notice because after she received the termination letter, she was unable to

continue her practice as she normally would have, with her practice essentially being shut down at the beginning of the three-month period just after she received her termination notice.[13]  She also believed that KDMS acted to prevent her from obtaining new employment with OLBH after June 2013, as retaliation.

## VI.    Complaint and Counterclaims

In May 2016, after having contacted Dr. Hutchison's counsel about its demand for repayment and not receiving repayment, KDMS filed its complaint against Dr. Hutchison for breach of contract and unjust enrichment.  It sought to recover $198,069.30 against Dr. Hutchison based on its advancement of payments to her that she did not earn and failed to repay, along with pre-judgment and post-judgment interest.

Dr. Hutchison answered and filed counterclaims against KDMS, seeking to be excused from having to repay the money owed.  She argued she was wrongfully terminated from her employment "with discriminatory and retaliatory

---

[13] Dr. Hutchison testified that in "April 2013, the first of April, they cancelled all my surgeries that had been scheduled out to June.  I had discovered that April 3 or April 5 that all of my surgeries were being cancelled without my knowledge."  She also testified that after her clinic was closed she was told she would be able to assist in contacting her cancer patients and other patients to ensure they had follow-ups, but was not allowed to do this and staff was giving out prescriptions in her name after the clinic was closed, specifically for eight patients "using my name on April the 18th [2013]" and wanting medication sample packages back so they could give them out even though "[t]here was no one in that office medically able to give out medications[.]"  She also indicated that during this time period she could not follow up on high risk patients and "was locked out of computers."  She was unhappy that her patients were sent letters that she had closed her clinic during this time period, when it had not been her choice.

intent and illegal, non-legitimate reasons." Dr. Hutchison argued that KDMS breached the contract by: failing to provide competent billing staff and coding education for billing staff who engaged in improper billing practices, with KDMS failing to timely submit charges for reimbursement, and failing to make adequate space, equipment, supplies, and staffing available to her. She also alleged she was subject to systematic discrimination as compared to similarly situated male employees. She alleged KDMS took away and rearranged her operating time with patients because of her gender and in retaliation for various legally protected actions and comments; switched her surgeries "so that a lessor-trained [sic] or experienced male counterpart would replace her in the operating room"; her male colleagues received preferential treatment regarding scheduling and opportunities to grow their practices; she received disparate treatment as compared to similarly situated male counterparts regarding her employment including on multiple occasions cancelling her scheduled surgeries without any valid reason; she was denied access to the Si Robot; and was told "the boys want you gone." She also argued that in January 2013, without any reason or explanation her income was cut in half and she was asked by Marks why she had not quit yet. Dr. Hutchison also argued that when her termination letter was issued on March 7, 2013, she was locked out of her office and the hospital computer system, which denied her access to patient medical records, prevented her from being able to continue caring for

patients until June 7, 2013 (when her termination became effective), and she was unable to follow up with patients who had serious conditions.

Dr. Hutchison's specific counts on her counterclaim were that KDMS: (1) breached its contract with her; (2) violated the Kentucky Health Care Whistleblower Statute, Kentucky Revised Statutes (KRS) 216B.165; (3) committed gender discrimination against her, KRS 344.040; (4) wrongfully terminated her based on gender discrimination; (5) retaliated against her; (6) retaliated against her by terminating her; (7) committed fraud against her by engaging in irregular billing practices by allowing Dr. James to bill for her services as his own; and (8) committed IIED. Dr. Hutchison sought compensatory damages, back pay and front pay, punitive damages, attorney fees, pre- and post-judgment interest, and taxable costs.

The parties engaged in extensive discovery, which included taking the depositions of Dr. Hutchison and Marks and the submission of numerous accompanying exhibits.

In April 2020, KDMS filed a motion for summary judgment on all claims. Dr. Hutchison requested more time to complete discovery, which the circuit court denied. In July 2020, Dr. Hutchison then filed her own motion for partial summary judgment, seeking judgment in her favor on KDMS's breach of contract and unjust enrichment claims and her counterclaims. On November 4,

2020, the circuit court granted KDMS's motion for summary judgment and denied Dr. Hutchison's motion for partial summary judgment.

## APPEAL

Pursuant to the Kentucky Rules of Civil Procedure (CR) 56.03, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996). Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky. 1991) (quoting *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)).

### I.     Breach of Contract

KDMS and Dr. Hutchison each argued that the other party breached the terms of the Agreement. KDMS argued that Dr. Hutchison breached the

Agreement by failing to pay it back money it advanced to her through draws that she had not earned, while Dr. Hutchison sought to avoid having to repay these funds, claiming that KDMS breached the Agreement first by depriving her of adequate staff, adequate billing, adequate access to the Si Robot, and cutting off her access to the computer system and patients immediately after giving her notice of termination.

In its factual findings, the circuit court found that under the terms of the Agreement Dr. Hutchison was required to pay KDMS back if her draws exceeded her total compensation; her increased draws continued to exceed her total compensation; KDMS exercised its option to terminate the employment relationship without cause; and when the employment relationship ended, Dr. Hutchison's account with KDMS exceeded her actual total compensation by $198,069.30. The circuit court specifically found:

> Hutchison has offered no evidence to challenge the accuracy of this amount owed under the Agreement. As stated above, the accuracy of this amount is established by the Affidavit of Sara Marks and by the spreadsheet summary of Hutchison's financial performance submitted with KDMS's motion.

The circuit court considered Dr. Hutchison's primary defense to KDMS's claims – that she was given inadequate or inferior access to a da Vinci Si Robot for her operating room procedures during her employment – and made factual findings that undisputed record evidence disproved that, including: the Si

-20-

Robot was not purchased for the gynecologists or Dr. Hutchison; and Dr. Hutchison was incorrect that her access to the Si Robot was limited based upon the affidavit of Milum, who summarized operating room schedules and robotic procedures performed during 2012 based on KDMC's records, establishing that:

> [F]rom March 2012 until the end of 2012, Hutchison performed more procedures on the Si Robot than any of the other OB/GYN physicians, male or female. Hutchison had more, not less, access to this equipment than the other OB/GYNs. . . . Hutchison performed 66 procedures on the Si Robot in 2012. Only one physician, Dr. Eric Smith, performed more procedures (76) on the Si robot during that time. Dr. Smith is a general surgeon who performed a large volume of single-site procedures that required the Si Robot. Thus, Hutchison had more access to the Si Robot than all but one of the other physicians.

The circuit court also pointed out that Hutchison offered no evidence to challenge the accuracy of this evidence.

The circuit court found that Marks decided to terminate the employment relationship without cause based on various factors including Dr. Hutchison's poor financial performance, complaints from operating room employees about her unprofessional language and behavior, Dr. Hutchison's dissatisfaction with her operating room schedules, and the parties' mutual dissatisfaction with the employment relationship.

The circuit court found that Marks's unrefuted affidavit established that Hutchison had appropriate office staff consistent with that provided to other

KDMS physicians and that KDMS appropriately billed and collected for Hutchison's professional services, billing over $2.38 million and collecting over $812,000, equating to a 34% collection rate which is within the normal range for a surgery specialty physician billing at KDMS.

Based on these factual findings, the circuit court determined that Dr. Hutchison breached the Agreement by failing to reimburse KDMS; KDMS did not breach the contract by failing to provide her sufficient support staff, office space, access to the Si Robot, and not billing for her services appropriately; and "[a]s a matter of law, there is no admissible evidence to support Hutchison's claim that KDMS breached its obligations under the employment agreement"; and therefore as a matter of law "Hutchison breached the employment agreement" by failing to reimburse KDMS and KDMS is entitled to judgment as a matter of law to recover the amounts owed by Hutchison. It determined because there was a written contract and breach of that contract, that KDMS's claim for unjust enrichment was moot.

Dr. Hutchison argues that the circuit court erred in granting summary judgment to KDMS. She argues that as to the breach of contract claim, KDMS was not entitled to a judgment as KDMS breached the Agreement first by not providing her with adequate staffing and endangering patients as a result; not providing adequate billing staff; and not providing her with adequate space,

-22-

equipment, supplies, or resources necessary to operate her practice including denying her access to the Si Robot in favor of her male colleagues, due to her gender. Dr. Hutchison argues that KDMS's material breaches and discriminatory actions effectively precluded her from practicing medicine, and rendered her performance of the Agreement futile and/or impossible. She also argues that despite stating in the March 7, 2013, termination notice that June 7, 2013, would be her last day of employment, KDMS immediately denied her access to her patients and the computer system, effectively ending her employment early.

"To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cnty. Government v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009).

We are confident that KDMS established conclusively that Dr. Hutchison breached her contract with it by failing to repay the excess money she received through her draws and that the circuit court correctly found that this was so based on the undisputed evidence. The only question is whether Dr. Hutchison established there were factual disputes as to the breaches of the contract that she alleged and damages following from those breaches which might mitigate this total.

Having reviewed the evidence, it is evident that Dr. Hutchison has failed in her burden to establish that there is a factual dispute that KDMS did not provide her with adequate staffing; did not provide her with adequate billing staff; and did not provide her with adequate space, equipment, supplies, or resources necessary to operate her practice including denying her access to the Si Robot. While Dr. Hutchison may have been unhappy that at times she did not have a full complement of staff, or with the amount of training they had prior, the Agreement does not require that she always have full staffing or any mandatory prior experience they should have had, and Dr. Hutchison has failed to raise a factual dispute that she was thereby harmed. While Dr. Hutchison made many claims about inadequate billing, she has failed to identify any claims in which inadequate billing led to non-collection of her fees.[14]

While it is obvious that Dr. Hutchison would have preferred to have "first-dibs" on all Si Robot time during her scheduled surgery slot, she has not established that access to the Si Robot some of the time and access to the S Robot

---

[14] We recognize it is difficult to establish a non-event, especially years after the fact, but Dr. Hutchison has also failed to present any affidavits from any people who she references as having informed her of deficits in billing or provide any documentation that she made any complaints about this to KDMS so that it could correct the situation. Specific claims regarding non-billing of the ultrasounds she provided were refuted by KDMS records indicating that more than 500 ultrasounds were billed during her tenure at KDMS as related in Marks's affidavit. Dr. Hutchison was also unable to identify any procedures which were not collected upon due to lack of proper prior consent and authorization, while Marks asserts that she searched the appropriate records and was unable to find any instances when this occurred.

some of the time was inadequate where previously she had only access to the S Robot. While we can certainly understand that all surgeons would prefer the best equipment to deliver the best results possible for all of their patients, Dr. Hutchison has failed to establish that the S Robot was an inadequate option or if it was that having a surgery delayed so that the Si Robot could be used was not a sufficient solution, given that the Si Robot was a limited resource that had to be shared by all of the surgeons.

However, Dr. Hutchison's unrefuted argument that despite stating in the March 7, 2013, termination notice that June 7, 2013, would be her last day of employment, KDMS immediately denied her access to her patients and the computer system, effectively ending her employment early, merits further consideration. Dr. Hutchison has repeatedly raised this argument, in her counterclaim, in her motion for summary judgment, and in her appellate brief. We note that KDMS did not address this argument and neither did the circuit court.

The Agreement is silent as to what is supposed to occur in the ninety days between when notice of termination is given and the actual termination of employment. While certainly patients would need to be given notice so that they could seek continuing care elsewhere, it is unclear whether Dr. Hutchison should not have been allowed to continue to treat patients to the extent possible during that period and to continue to earn income. The Agreement also does not provide

an exception to the non-compete clause during that time. We believe that Dr. Hutchison is certainly a proper witness as to the lack of such access and that if true she would be damaged as it would limit her ability to produce income during the last three months of her employment with KDMS while also preventing her from working elsewhere.

Therefore, while we affirm that Dr. Hutchison breached the Agreement with KDMS by failing to pay it back the money she owed it, it was not proper for summary judgment to be granted to KDMS on the breach of contract issue without first resolving this issue regarding whether it may have also breached the contract by effectively prematurely terminating her employment sooner than ninety days by cutting off her access to the computer system and her patients, preventing her from performing her employment between March 7, 2013, and June 7, 2013. As factual issues remain regarding what occurred in this limited period of time, and the contract is ambiguous as to what should have occurred, summary judgment cannot be granted to KDMS on its breach of contract claim. Whether Dr. Hutchison may thereby be excused from having to repay any portion of the $198,069.30 that it has been established she owes KDMS as a set off, if KDMS's actions during that time were indeed a breach of the contract, is an issue that cannot be resolved at this time. Therefore, we reverse and remand on this issue.

## II. Gender Discrimination

Dr. Hutchison argued she was discriminated against for her gender by being denied access to the Si Robot and being terminated. The circuit court rejected that Dr. Hutchison could establish gender discrimination where she had no direct evidence of gender discrimination and could not present a *prima facie* case of gender discrimination under the burden-shifting analysis of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as she failed to prove a similarly situated male received more favorable treatment. The circuit court explained Dr. Hutchison "failed to produce any evidence of a similarly situated employed male physician whose employment agreement was not terminated under similar circumstances as Hutchison's employment was terminated" and could not establish denial of access to the Si Robot compared to a similarly situated male OB/GYN physician employee, requiring dismissal of her discrimination claims as a matter of law. The circuit court determined that even if Dr. Hutchison could make out a *prima facie* case of gender discrimination, she failed to identify any admissible evidence that KDMS's stated reason for terminating her employment was pretext for gender discrimination. It further indicated that her subjective belief now was insufficient, noting that "during her deposition, Hutchison testified that she believed she was terminated because she had applied for privileges at OLBH, not because of gender discrimination." The

circuit court specifically rejected that Dr. Hutchison could properly qualify or soften her damaging deposition testimony via her later affidavit, explaining "an affidavit that contradicts earlier sworn testimony cannot be used to defeat a motion for summary judgment."[15]

Dr. Hutchison argues that she has established a *prima facie* case for gender discrimination because: as a woman she is a member of a protected group, it is undisputed that her employment was terminated early even though she was objectively qualified for the position and KDMS's only female OB/GYN, male doctors were treated better than she was at KDMS with OB/GYN Dr. Richard Ford being hired after she was terminated and then being promoted to Chief Medical Officer, and Dr. James also being hired by KDMS. She states that the burden of production thus shifted to KDMS to articulate a non-discriminatory reason for her termination, but that KDMS's shifting reasons for why it terminated her makes all of these justifications suspicious, and "[t]here is significant evidence that KDMS

_____

[15] In Dr. Hutchison's affidavit, she stated the following:

> 7. I stated in my deposition that KDMS terminated me due to my seeking hospital privileges at Our Lady of Bellefonte Hospital among other reasons. To clarify, this was not the only reason that I believe that KDMS terminated my employment. More specifically, I think that KDMS terminated my employment because I raised concerns about my working conditions, specifically, that KDMS increasingly denied me access to the Si Robot based on my gender, that KDMS did not provide me adequate staff for my procedures or for my billing purposes, and that KDMS endangered patients by cancelling my procedures on the Si Robot on short notice.

-28-

terminated Hutchison's employment because she raised concerns about her working conditions and about KDMS denying her access to the Si Robot based on her gender," which was "also the reason that she was afforded fewer opportunities than 'the Boys' at KDMS."

KRS 344.040(1)(a) provides in relevant part that: "It is an unlawful practice for an employer: . . . to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex[.]" To establish a *prima facie* discrimination action on the basis of gender, Dr. Hutchison must provide proof that: "(1) she was a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated males were treated more favorably." *The Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016) (footnote omitted). If Dr. Hutchison can establish a *prima facie* case of discrimination, then the burden shifts to KDMS to offer a "legitimate, nondiscriminatory reason" for its actions, then the burden shifts a final time, with Dr. Hutchison then needing to "be afforded a 'fair opportunity' to show that [the adverse employment action] was 'in fact pretext' for discrimination." *Id.* (citation omitted).

We agree with the circuit court that Dr. Hutchison cannot establish a *prima facie* case because she cannot establish that similarly situated males received better treatment. The problem for Dr. Hutchison is that the male OB/GYNs were not employees of KDMS; instead, they only had privileges at KDMC. They were thus not similarly situated, and their employment could not be terminated by KDMS. However, even had she established a *prima facie* case of gender discrimination, KDMS provided several reasonable explanations as to why it decided to terminate her employment and we are confident that her objective failure to continue to perform well in generating income for KDMS was a legitimate reason to terminate her.

The circuit court incorrectly characterized Dr. Hutchison's deposition testimony to indicate that she believed she was terminated for seeking privileges at OLHB, as her deposition testimony provided this as one reason she believed she was terminated while she had also testified earlier that she believed her termination was in retaliation for complaining about her lack of access to the Si Robot, changes in her surgery schedule, and inadequate staffing for the Si Robot and her clinic, with her obtaining privileges elsewhere essentially being "the straw that broke the camel's back" and causing KDMS to finally decide to terminate her. Dr. Hutchison's deposition testimony was sufficiently clear on this point and her

affidavit simply reiterated this position. However, this characterization by the circuit court was not dispositive.

While seeking privileges at OLBH without prior permission was indeed a violation of the Agreement, this was not listed as a basis for the termination. Just because KDMS had a variety of bases to choose from when it came to deciding to terminate her, and its agents may not have been entirely consistent when explaining its reasoning, does not imply that in fact her termination was discriminatory.

As to access to the Si Robot, the unrefuted evidence shows that Dr. Hutchison's subjective perception that she was granted less time with the Si Robot than similarly situated physicians was incorrect based on the KDMC records which indicate that she performed more procedures with the Si Robot than any other physicians with privileges at KDMC other than general surgeon Dr. Smith.[16] Dr.

---

[16] This is according to Milum's affidavit. As to the Si Robot, Milum summarized that from April 1, 2012, through December 31, 2012, only general surgeon Dr. Smith (who had Monday and Wednesday surgery days) performed more procedures on the Si Robot, 76 to Dr. Hutchison's 66, but Dr. Hutchison performed 57 Si Robot surgeries on Wednesdays compared to 33 for Dr. Smith on Wednesdays. In comparing the rates of using the Si Robot by all the OB/GYN physicians in that same period, Milum stated that Hutchison's rate was 66 compared to her next closest OB/GYNs of Dr. Modi at 37, Dr. Dodi at 34, and Dr. Frederick at 29.

In contrast, Dr. Hutchison made claims in her affidavit that were not objectively verifiable and were in contradiction of the records and Marks's testimony but failed to explain why the records or Marks's testimony was incorrect. These included Dr. Hutchison's statement that: "At the end of 2011, I performed seventy-five percent (75%) of all robotic procedures at KDMS. At the end of 2012, this number decreased to less than ten percent (10%)."

Hutchison cannot be considered similarly situated to a general surgeon who simply performed more operations than she. Assuming she was similarly situated to the OB/GYNs who had privileges at KDMC regarding her right to access the Si Robot on her surgery days, the undisputed evidence was that she performed more operations using the Si Robot than those male OB/GYNs.

While Dr. Hutchison repeatedly states her belief that she was not given equal access to the Si Robot, KDMC records belie that belief. As explained in *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990), "'[b]elief' is not evidence and does not create an issue of material fact. A plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." However, Dr. Hutchison has not been able to present any evidence that her belief that she had less access than similarly situated male physicians is in fact true and she does not challenge the accuracy of the records establishing otherwise.

We do not dispute that Dr. Hutchison may indeed have been subjected to sexual animus by some male physicians that had privileges at KDMC, but KDMS's ability to control the actions of these physicians who were not its employees was severely limited. Additionally, while they may have made complaints about her and treated her differently, Dr. Hutchison has not established that KDMS acted on unfounded complaints to her detriment or that these physician's actions caused KDMS to discriminate against her and provide her with

decreased access to surgical resources.  Dr. Hutchison has failed to connect any alleged sexism by these physicians to a deprivation of access to the Si Robot by KDMC staff or to her termination by KDMS.

Additionally, despite Dr. Hutchison's repeated conflating of KDMS as encompassing KDMC, these are separate (although related) entities.  KDMC is not a party to this suit and it was responsible for providing the Si Robot (not KDMS), and KDMC was not Dr. Hutchison's employer or the employer of the male physicians at issue.

Therefore, we agree with the circuit court that it was appropriate to grant summary judgment to KDMS on Dr. Hutchison's gender discrimination claim.

## III.  Patient Safety Act

Dr. Hutchison argued that a report she made while employed by Dr. James about another physician and not having sufficient staff in relation to robotic surgery and reporting that should be protected pursuant to KRS 216B.165, the Patient Safety Act, and that she was terminated in retaliation for reporting these concerns about patient safety.  The circuit court determined that this claim failed as a matter of law for failure to present a *prima facie* case because Dr. Hutchison failed to prove she engaged in a protected activity under the Act.  The circuit court rejected Dr. Hutchinson's claim that her complaint on December 20, 2012, over

her access to the Si Robot could qualify, explaining that the "complaint was not related to patient safety or care, but rather to what she believed to be unfair scheduling changes and her access to the Si Robot."[17]  The circuit court noted that even if that complaint "could be considered protected activity, Hutchison's own testimony regarding the reason for her termination precludes the Court from finding pretext" as she believed she was terminated because she applied for privileges at OLBH rather than in retaliation for making complaints relating to patient safety.  Accordingly, the circuit court dismissed these claims as a matter of law.

Dr. Hutchison argues she established a *prima facie* case that she engaged in a protective activity by reporting her safety concerns to KDMS regarding its failure to provide her with a sufficient number of adequately trained staff members, which went unaddressed, and she was retaliatorily terminated by KDMS just weeks after she made these reports.

KRS 216B.165 states in relevant part that:

(1) Any . . . employee of a health care facility or service
licensed under this chapter who knows or has reasonable
cause to believe that the quality of care of a patient,
patient safety, or the health care facility's or service's
safety is in jeopardy shall make an oral or written report
of the problem to the health care facility or service . . .

---

[17] We do not address the circuit court's rejection of Dr. Hutchison's prior claim regarding protected activity in reporting another physician's endangerment of patient safety prior to her being employed by KDMS because she waived that argument by not renewing it on appeal.

. . .

> (3) No health care facility or service licensed under this chapter shall by policy, contract, procedure, or other formal or informal means subject to reprisal, or directly or indirectly use, or threaten to use, any authority or influence, in any manner whatsoever, which tends to discourage, restrain, suppress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any agent or employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the health care facility or service the circumstances or facts to form the basis of a report under subsections (1) or (2) of this section.

"KRS 216B.165(1) requires employees of a health care facility to report quality of care and safety problems" and "KRS 216B.165(3) states that health-care facilities shall not hinder the ability of employees to make these reports." *Foster v. Jennie Stuart Medical Center, Inc.*, 435 S.W.3d 629, 635 (Ky. App. 2013).

The problem for Dr. Hutchison is that even if we assume that her reports about inadequate staffing of the Si Robot in that the staff were not able to troubleshoot the robot which could have been problematic for patient care constituted a *prima facie* case for violation of the Patient Safety Act, KDMS amply established a myriad of objective reasons for her termination. Furthermore, it appears that her reports were buried and subsumed within a variety of complaints having to do with her supposed lack of access to the Si Robot and her disagreement with how that resource was allocated and cannot be connected with her discharge. Therefore, this claim was appropriately dismissed.

## IV. Retaliation

Dr. Hutchison brought a claim that she was wrongfully retaliated against for the complaints she made regarding gender discrimination and patient safety, as is prohibited under the Civil Rights Act, KRS 344.280(1), by rearranging her operating times and discharging her. The circuit court found these were restatements of her rejected gender discrimination claims, which must also be dismissed as a matter of law.

Dr. Hutchison argues that she was retaliated against for raising concerns about gender discrimination and patient safety by being denied opportunities to use the Si Robot, by being sent a termination letter and then immediately denied access to her patients, and then by being terminated. She states that the causal connection between her complaints and termination is undeniable because she made her complaints to Marks, Marks was aware she made complaints to others as they had a meeting regarding her concerns, and Marks testified that Dr. Hutchison's complaints played a role in the decision to terminate her.

KRS 344.280 states in relevant part:

It shall be an unlawful practice for a person, or for two (2) or more persons to conspire:

(1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a

charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter[.]

We note that the Patient Safety Act does not fall within this chapter and, thus, KRS 344.280 cannot apply to such a claim. As to gender discrimination, we agree with the circuit court that the prior disposal of such claim precludes the application of KRS 344.280(1).

## V. Fraud

Dr. Hutchison argued that KDMS participated in Dr. James's fraud toward her and was legally responsible for it. The circuit court rejected this claim, determining that "Hutchison has neither alleged nor identified any misrepresentation made by KDMS that could support a claim for fraud" as these were claims involving Dr. James's billing for her professional services when she was employed by him.[18] It found that Dr. James was not an employee of KDMC or KDMS while Dr. Hutchison worked for him, and KDMS was not involved in billing for Dr. Hutchison's services during that time.[19] The circuit court rejected

---

[18] Dr. Hutchison denied being employed by Dr. James; instead, in her deposition she described a recruiting agreement by King's Daughters (which appears to refer to the hospital) to set up a practice there, and that she had an office sharing arrangement with Dr. James and Dr. Modi in which they would share expenses and paid a third party to do billing, with her functioning more like a partner to Dr. James. However, the exact nature of their relationship is immaterial.

[19] Dr. Hutchison specifically denied in her deposition testimony that Dr. James worked for KDMC or KDMS or that the person doing billing for those three doctors worked for either entity.

the ostensible agency could apply here as "Hutchison has cited no case where a hospital was held responsible to an independent physician's employee for conduct between the independent physician and that employee." It also noted that Hutchison's deposition testimony established she understood that Dr. James was not an employee of KDMS. Therefore, it dismissed that claim.

Dr. Hutchison again alleges that Dr. James was KDMS's Chief of its OB/GYN department at the time he engaged in fraud against her, and KDMS should be liable as it "not only held James out to be an agent of KDMS, but as a leader of one of its clinical departments." She argues this is shown by

> contemporaneous KDMS advertising material from the time, listing James, along with Hutchison, on KDMS advertising materials with KDMS' logo. As a department chair, James was more than just a physician with privileges at KDMS and had specific authority from KDMS to set policy for the OB/Gyn Department and, thus, to ostensibly act as an agent of KDMS, its board, and its leadership.

Dr. Hutchison argues as a department leader Dr. James should be considered an agency of the hospital and "[b]ecause there is no material dispute that James was the chair of KDMS's OB/GYN Department when he took fraudulent actions, KDMS was not entitled to summary judgment on Hutchison's Counterclaim for fraud."

"In a Kentucky action for fraud, the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a)

-38-

material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). However, it does not matter if Dr. Hutchison has established a *prima facie* case of fraud against Dr. James when he is not a party to this action and his actions cannot be imputed against KDMS. Because Dr. Hutchison knew Dr. James was not an employee of KDMS, it does not matter if advertising material might have implied that he was an employee of it.

Additionally, Dr. Hutchison again conflates KDMC with KDMS. The advertisements in which she states that KDMS held out Dr. James as its agent were in fact advertisements for KDMC which simply listed that he practiced at KDMC, the same as advertisements it made for Dr. Hutchison while she was working with Dr. James. None of these documents identifies Dr. James as being a department leader, chief, or chair of KDMC's or KDMS's OB/GYN department. It is most certainly disputed that he had such a role, especially as Dr. Hutchison specifically admits that when she was hired by KDMS, she was their only OB/GYN employee. Nothing but Dr. Hutchison's subjective belief that Dr. James had such a connection to KDMS appears to support this claim. This was insufficient to defeat the motion for summary judgment and this claim was appropriately dismissed against KDMS.

## VI. Intentional Infliction of Emotional Distress

Finally, Dr. Hutchison argued she was entitled to damages for IIED due to her wrongful termination. The circuit court concluded that Dr. Hutchison had not identified any admissible evidence that met the high standard required to make out a *prima facie* case of IIED and "[m]ore importantly, it is settled that IIED claims are subsumed by claims under the Kentucky Civil Rights Act and must be dismissed when brought with claims under the Act." It dismissed this claim.

Dr. Hutchison argues that she suffered from retaliation and discrimination, which were by definition outrageous and intolerable, as she was sexually discriminated against by "the Boys," told that "the boys want you gone," and then Marks asked her "why haven't you quit yet?" She also argues she suffered significant financial hardship and severe emotional distress as a result because she lost her home and could not afford to send her son to a world premiere school.

"[T]he elements [of IIED] are: (1) intentional or reckless conduct; (2) that was outrageous or intolerable and offends against the generally accepted standards of decency and morality; (3) which caused emotional distress; and (4) the distress was severe." *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 293-94 (Ky. App. 2009). Not every case in which a wrong has been committed is sufficient to establish IIED.

Kentucky courts have found plaintiffs' proof of outrageous conduct sufficient to support an outrage/IIED claim in cases where the defendants: (1) harassed the plaintiff "by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic"; (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; (3) engaged in "a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring [plaintiff] to his knees"; (4) committed same-sex sexual harassment in the form of "frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex"; (5) was a Catholic priest who "used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife"; (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter; and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.

Outrageousness has been found lacking, however, in less-egregious cases where the defendant: (1) refused to pay medical expenses arising out of an injured worker's compensation claim; (2) wrongfully converted the plaintiff's property in a manner that breached the peace; (3) negligently allowed his vehicle to leave the road and struck and killed a child; (4) committed "reprehensible" fraud during divorce proceedings by converting funds belonging to his spouse for the benefit of defendant and his adulterous partner; (5) wrongfully terminated the plaintiff; (6) displayed a lack of compassion, patience, and taste by ordering plaintiff, who was hysterical over the fact that she had just delivered a stillborn child in her hospital room, to "shut up" and then informing her that the stillborn child would

be "disposed of" in the hospital; (7) erected a billboard referencing defendant's status as a convicted child molester; (8) wrongfully garnished plaintiff's wages pursuant to a forged agreement; and (9) impregnated plaintiff's wife. Courts have found other elements of the prima facie case missing, or have otherwise found recovery pursuant to § 46 unavailable, in cases where the defendant: (1) a Catholic priest, sexually abused a ten-year-old boy; (2) breached a promise to marry; (3) chained a high school student to a tree by his ankle and neck; and (4) shot and killed a beloved family pet, which had been misidentified as a stray dog.

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789-91 (Ky. 2004), *overruled on other grounds by Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 287 (Ky. 2014) (citations omitted).

Typically, a wrongful discharge, even if based on discrimination, is not outrageous enough to qualify as IIED. *See Benningfield v. Pettit Environmental, Inc.*, 183 S.W.3d 567, 572 (Ky. App. 2005) (and cases cited within); *Bednarek v. United Food and Commercial Workers Intern. Union, Local Union 227*, 780 S.W.2d 630, 632 (Ky. App. 1989).

As we have previously explained, Dr. Hutchison cannot establish any discrimination took place; therefore, that alone is an appropriate basis for affirming the dismissal of this claim. We also emphasize that even if the discrimination claim was established, the evidence could not show that KDMS's conduct was so outrageous as to establish IIED.

## CONCLUSION

Accordingly, we affirm the Boyd Circuit Court's grant of summary judgment to KDMS dismissing all of Dr. Hutchison's counterclaims, reverse the grant of summary judgment to KDMS regarding the breach of contract claim to the extent that Dr. Hutchison has established there is a question of fact as to whether KDMS breached the contract by effectively terminating her without proper notice where she alleged she was immediately denied access to the computer system and her patients upon notice of termination but affirm that KDMS has established Dr. Hutchison's debt to it in the amount of $198,069.30 subject to a possible claim for set off if Dr. Hutchison can establish that this specific breach occurred and prevented her from earning money during the ninety days in which she was to continue in her employment under the terms of the Agreement.

ACREE, JUDGE, CONCURS IN RESULT ONLY.

DIXON, JUDGE, CONCURS IN RESULT ONLY.

BRIEF FOR APPELLANT:

Christopher B. Congeni
Akron, Ohio

BRIEF FOR APPELLEE:

W. Mitchell Hall, Jr.
Olivia Holbrook Gilkison
Ashland, Kentucky