RENDERED: OCTOBER 11, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0091-WC

GENERAL MOTORS                                                    APPELLANT

PETITION FOR REVIEW OF A DECISION
v.                OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-22-91822

BRANDI WOODS; HONORABLE
GRANT STEWART ROARK,
ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION
BOARD                                                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, CETRULO, AND ECKERLE, JUDGES.

CALDWELL, JUDGE: General Motors ("GM") petitions for review of a

Workers' Compensation Board ("Board") opinion affirming an Administrative

Law Judge's ("ALJ") award of benefits to Brandi Woods ("Woods"). GM argues

that the ALJ erroneously included a lump sum vacation payment in calculating

Woods' average weekly wage and so the Board erred in affirming the ALJ's initial

opinion, order, and award and the ALJ's denial of GM's petition for reconsideration. GM also raises a constitutional challenge to interest provisions in KRS[1] 342.040, which we decline to address due to failure to strictly comply with RAP[2] 49(G)(3) given the lack of indication that the Attorney General was served with the response to the petition for review. We affirm the Board.

## FACTUAL AND PROCEDURAL BACKGROUND

Woods filed a workers' compensation claim in May 2022. Woods and GM stipulated Woods sustained a work-related injury on January 26, 2022, and timely notice of the injury was given. They also stipulated GM paid to Woods temporary total disability ("TTD") benefits for various periods in 2022.

The ALJ conducted a final hearing on Woods' claim in late April 2023. Woods testified at the hearing. Both parties also submitted medical reports. The ALJ found that Woods reached maximum medical improvement on November 7, 2022. The ALJ also found Woods to be permanently partially disabled with an impairment rating of twenty-one percent (21%).

Despite not challenging the ALJ's finding of a 21% permanent impairment rating, GM has argued to the Board, and to this Court, the ALJ improperly included a payment of $1,384.32 referred to as "Vacat'n PR Payoff" in

---

[1] Kentucky Revised Statutes.

[2] Kentucky Rules of Appellate Procedure.

GM's records when calculating Woods' average weekly wage. Calculating the proper amounts of payments for TTD and for permanent partial disability ("PPD") benefits depends in part on the employee's average weekly wage. *See* KRS 342.730(1)(a)-(b).

KRS 342.140 governs the calculation of an employee's average weekly wage. The parties agree the calculation of Woods' average weekly wage is specifically governed by KRS 342.140(1)(d)[3] since she had been working for GM for at least thirteen weeks and was paid by the hour. KRS 342.140(1)(d) states if "wages were fixed by the day, hour, or by the output of the employee," then:

> the average weekly wage shall be the wage most favorable to the employee computed by dividing by thirteen (13) the wages (not including overtime or premium pay) of said employee earned in the employ of the employer in the first, second, third, or fourth period of thirteen (13) consecutive calendar weeks in the fifty-two (52) weeks immediately preceding the injury[.]

The parties agree that the relevant, most favorable quarter for Woods was the thirteen weeks preceding her work injury in late January 2022.

Records submitted by GM list payments made to Woods over the thirteen weeks preceding her late January 2022 work injury. Included in this list

---

[3] KRS 342.140 was recently amended with the amended version to take effect on July 15, 2024. However, KRS 342.140(1)(d) was not substantively amended. The version of KRS 342.140 in effect from 2010 through early July 2024 was the version in effect from the time of Woods' injury in January 2022 through all proceedings before the ALJ and Board.

were various payments made to Woods the same week ending January 23, 2022. (GM refers to this week as 04UW and its records refer to January 17, 2022, and January 23, 2022, after its listing of payments made for this week.) The payments made to Woods for week 04UW (ending January 23, 2022) together totaled about $2,915.00. But GM crossed out a payment of about $1,384.32 marked as "Vacat'n PR Payoff" and another, smaller amount of not quite $120 for "overtime paid .05." Omitting the $1,384.32 "Vacat'n PR Payoff" and the smaller amount, GM asserted that just $1,411.52 had been paid to Woods as wages for week 04UW (ending January 23, 2022) – including amounts paid for about 23 hours of work, eight hours of holiday time, and sixteen hours of vacation.

But Woods argued for including the $1,384.32 in "Vacat'n PR Payoff" along with other payments made over the last thirteen weeks preceding the injury in calculating her average weekly wage. Accepting Woods' argument, the ALJ calculated Woods' average weekly wage to be $972.53. The ALJ noted GM had argued for an average weekly wage of $863.98 based on GM's interpretation of its payment data. (GM had called for excluding, *inter alia*, the $1,384.32 in "Vacat'n PR Payoff" in calculating Woods' average weekly wage.) The ALJ also noted no evidence was presented about how to interpret the raw numbers in the payment records, so there was nothing in the record to support GM's interpretation. Rejecting GM's arguments, the ALJ stated he was instead

-4-

persuaded by Woods' argument that GM's wage calculations failed to properly include vacation time or "shift differential premium"[4] paid in the last quarter before the injury.

GM filed a petition for reconsideration, which the ALJ denied.

GM appealed to the Board, arguing that the ALJ erred in including the $1,384.32 for the "Vacat'n PR Payoff" in average weekly wage calculations. GM contended this payment should not have been considered in calculating the average weekly wage because it was not a substitute for work. GM asserted the payment of $1,384.32 represented 56 hours of vacation pay. GM pointed out this $1,384.32 payment was made during the same week that Woods was also paid for about 23 hours' work including about 9.7 hours overtime, 8 hours of holiday pay, and 16 hours of vacation pay – adding up to 57 hours. GM argued that Woods was paid for 113 hours that same week – clearly exceeding what would be paid during a typical 40-hour work week.

GM also pointed out that Woods did not testify about her average weekly wage or offer other documentary evidence about payments made. And GM asserted that Woods had the burden of proving her average weekly wage, citing

_____

[4] Although GM continues to challenge the inclusion of the "Vacat'n PR Payoff" of $1,384.32, GM later dropped its challenge to the inclusion of another, smaller amount – possibly relating to shift differential – in calculating the average weekly wage. So, it later indicated it would accept that Woods' average weekly wage was a few dollars more than $863.98.

-5-

*Nesco v. Haddix*, 339 S.W.3d 465, 472 (Ky. 2011) ("An injured worker bears the burden of proof and risk of non-persuasion before the fact-finder with regard to every element of a claim, including her average weekly wage.").

GM also argued to the Board that KRS 342.140 was aimed at realistically estimating what the worker would expect to earn absent the injury. It contended that adding the $1,384.32 payment for 56 hours of vacation time to other amounts paid for more than forty hours of combined work, vacation, and holiday time for that same week would artificially inflate Woods' average weekly wage and violate public policy.

However, the Board rejected GM's argument that the $1,384.32 "Vacat'n PR Payoff" should be excluded in calculating the average weekly wage and affirmed the ALJ's decision in its opinion entered December 22, 2023. The Board recognized that in calculating the average weekly wage based on thirteen consecutive weeks, weeks where no wages are earned must also be included in the computation based on *Belcher v. Manpower of Indiana*, 492 S.W.3d 156, 158 (Ky. App. 2015). And the Board noted Woods had several weeks of $0 in payments over the year preceding her injury, yet GM took issue with the one $1,384.32 payment in late January 2022 marked as "Vacat'n PR Payoff."

The Board discussed Kentucky appellate precedent regarding whether other types of payments, such as pensions, unemployment payments, or profit-

sharing bonuses, should be included in calculating a claimant's average weekly wage given the definition of wages in KRS 342.140.[5] KRS 342.140(6) defines *wages* as meaning:

> in addition to money payments for services rendered, the reasonable value of board, rent, housing, lodging, and fuel or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer to the extent the gratuities are reported for income tax purposes.

The Board cited a prior Board opinion noting vacation pay is treated as regular income for taxation purposes. It also cited its opinion in *Brooks v. Tri-State Industrial Services*, Claim No. 2006-97477 (rendered Apr. 30, 2009).[6] Apparently the Board cited its own opinions due to a lack of published Kentucky precedent regarding whether vacation pay should be included in calculating average weekly wage.

The Board noted its holdings in *Brooks* that vacation pay is money for services rendered and the $360 payment the claimant received in lieu of taking an annual vacation should be included in calculating his average weekly wage. It also noted its holding in *Brooks* that vacation received in lieu of time off must be pro-

---

[5] We quote to the version of KRS 342.140(6) effective prior to mid-July 2024. But in any event, KRS 342.140(6) was not substantively amended in 2024.

[6] Both the Board's opinion here and its prior opinion in *Brooks*, Claim No. 2006-97477, cited *General Electric Company v. Robinson*, Claim No. 95-32362 (rendered Mar. 7, 1997) for the holding that vacation pay is treated the same as regular income for taxation purposes.

rated over the entire year – but recognized this holding was based on Brooks' testimony about earning vacation pay in lieu of time off over the course of a year.

The Board took note in this case that GM had introduced its payment records (referred to as wage records in the administrative record) and that the Board could not remand the case to the ALJ to take further proof. The Board deferred to the ALJ's assessment of the weight and creditability of the evidence. The Board further noted that unlike *Brooks*, no testimony had been presented about the vacation payment at issue or how many hours of vacation pay Woods received.

The Board discussed significant distinctions between this case and *Brooks*. It held that the way the ALJ had calculated the average weekly wage by adding the $1,384.32 "Vacat'n PR Payoff" with the other payments noted for that quarter in GM's records was supported by the record here:

> Here, there are distinguishing factors supporting the ALJ's calculation in utilizing the raw data to find the most favorable quarter, which is precisely what the statute requires. In the fourth quarter, there were three of the 13 weeks with $0.00 wages. Six other weeks show wages over $1,000.00 per week. Three weeks show wages of more than $900.00 per week and one week indicating a wage greater than $800.00. The ALJ's inclusion of the vacation pay in this quarter accounts for the three weeks of $0.00 wages. There is no additional evidence outlining how many hours of vacation pay Woods received, making it more difficult to pro-rate the payout. The ALJ calculated the AWW [average weekly wage] at $972.53, which is a realistic figure based on the wage records produced. It is not for the Board to disturb

this finding of fact which was supported by substantial evidence.

Therefore, it affirmed the ALJ's decision.

GM then filed a petition for review in this Court, including a challenge to the constitutionality of KRS 342.040's interest provisions. GM served the Attorney General with a copy of its petition for review. However, there is no indication that the Attorney General was served with a copy of the response to the petition for review. *See* RAP 49(G)(3).

## ANALYSIS

### Standard of Review

"The function of further review of [the Board] in the Court of Appeals is to correct the Board only where the the [sic] Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992).

### No Reversible Error in Board's Affirming ALJ's Calculation of Average Weekly Wage

GM argues the Board erred in affirming the ALJ's calculation of the average weekly wage. GM notes Woods had the burden of proving every element of her claim including her average weekly wage and Woods introduced no testimony interpreting GM's payment records. GM contends the $1,384.32

payment for "Vacat'n PR Payoff" must be excluded when calculating Woods'

average weekly wage. In the alternative, GM requests that if the $1,384.32

"Vacat'n PR Payoff" is properly included in calculating the average weekly wage,

that it be pro-rated over a year pursuant to the Board's opinion in *Brooks.*

GM asserts the $1,384.32 "Vacat'n PR Payoff" was a payment for 56

hours and was paid during the same week in which Woods was paid for over 40

hours of holiday and vacation and regular work. GM contends that including the

$1,384.32 payment in calculating Woods' average weekly wage would violate

public policy.

In support, GM cites a de-published opinion from this Court[7] along

with a federal case construing federal Longshore and Harbor Workers'

Compensation Act provisions,[8] which it suggests resemble KRS 342.140's

provisions. But neither of these cited authorities are controlling authority for

resolving this Kentucky workers' compensation claim. *See* RAP 41(A) ("Not To

Be Published opinions of the Supreme Court and the Court of Appeals are not

---

[7] *See The Gap v. Curtis*, No. 2002-CA-001547-WC, 2003 WL 22064369 (Ky. App. Sep. 5, 2003) (de-published by Kentucky Supreme Court on August 19, 2004). The petition for review fails to state that this unpublished Kentucky appellate decision is not binding. *See* RAP 41(A)(4).

We are also aware that our Supreme Court entered its own published opinion affirming this Court despite de-publishing our opinion. *See The Gap v. Curtis*, 142 S.W.3d 111 (Ky. 2004).

[8] *See Ingalls Shipbuilding, Inc. v. Wooley*, 204 F.3d 616 (5th Cir. 2000).

binding precedent and citation of these opinions is disfavored") (internal quotation marks omitted); SCR[9] 1.030(8)(a) (stating the Court of Appeals is bound by precedent from the Kentucky Supreme Court and its predecessor court but not stating the Court of Appeals is bound by federal opinions). And though Kentucky courts may apply precedent from federal courts as persuasive authority, especially in contexts where state statutes closely resemble federal statutes,[10] GM has not cited, nor are we aware of, any binding Kentucky precedent demanding that federal precedent applying federal statutes must be followed to resolve claims filed pursuant to Kentucky workers' compensation statutes.

Just as unpublished Kentucky appellate opinions and federal precedent applying federal statutes are not binding, GM correctly points out that Board opinions such as *Brooks* are not binding on this Court. And GM argues that since Woods had already received payment for over 40 hours in combined work and holiday and vacation time, the $1,384.32 payment for an additional 56 hours could not be said to replace work that otherwise would have occurred. But as the

---

[9] Kentucky Rules of Supreme Court.

[10] *See, e.g.*, *The Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 306 (Ky. 2016) ("Because of its similarity to federal civil-rights legislation, the KCRA [Kentucky Civil Rights Act] tracks federal case law for guidance on claims based on gender discrimination"); *Harper v. University of Louisville*, 559 S.W.3d 796, 802 (Ky. 2018) ("Because the federal and Kentucky whistleblower legislation is similar, we have routinely looked to the federal courts' interpretation of the corresponding federal whistleblower statute as persuasive authority.").

Board recognized, the ALJ could reasonably infer that the $1,384.32 payment noted on GM's "wage records"[11] as some type of vacation payoff was to make up for other times within the same thirteen-week quarter in which Woods received $0 in wages (including the week of 1/9/22 just a couple of weeks before the $1,384.32 payment was made).

Furthermore, the Board correctly recognized that, without evidence about how Woods accrued vacation time or pay (such as how many hours of vacation time she accrued per year or quarter or other time period), this case is distinguishable from *Brooks* and there is no evidence compelling pro-ration of the $1,384.32 payment over the entire year. And, as the Board effectively noted, an average weekly wage of $972.53 is a realistic assessment of Woods' earnings

---

[11] Despite GM's arguments that Woods cannot prevail on the average weekly wage calculation issue because she did not offer evidence such as testimony about her vacation pay or other documentary evidence about interpreting the numerical data provided by GM, the ALJ considered "wage records" filed by GM (administrative record, page 190) as evidence. Given this documentary evidence submitted by GM, we cannot agree with any contention that there was no substantial evidence supporting the ALJ's average weekly wage calculations. As we have previously stated:

> To properly review the Board's decision, this Court must ultimately review the ALJ's underlying decision. Where the ALJ has found in favor of the party, who had the burden of proof, this Court must determine whether the ALJ's findings were supported by substantial evidence. . . . [A]s the fact-finder, the ALJ, not this Court and not the Board, has sole discretion to determine the quality, character, and substance of the evidence. Not only does the ALJ weigh the evidence, but the ALJ may also choose to believe or to disbelieve any part of the evidence, regardless of its source.

*Abbott Laboratories v. Smith*, 205 S.W.3d 249, 253 (Ky. App. 2006) (footnotes omitted).

-12-

based on the payments noted in GM's payment records for the thirteen weeks preceding the injury.

So, the Board did not overlook or misconstrue controlling statutes or precedent regarding the treatment of vacation pay in calculating average wages. Nor has it committed an error in assessing the evidence so flagrant as to cause gross injustice since substantial evidence of record supports the ALJ's treatment of the vacation pay at issue. *See Kelly*, 827 S.W.3d 687-88. Therefore, we affirm the Board's resolution of this issue.

### We Decline to Address Constitutional Challenge to KRS 342.040 As GM Has Not Shown that it Provided the Attorney General with Service of the Response to its Petition for Review in Contravention of RAP 49(G)(3)

RAP 49(G)(3) states:

> In any case in which the constitutionality of a statute is questioned, a copy of the petition and response shall be served on the Attorney General by the party challenging the validity of the statute. The Attorney General may file an entry of appearance no later than 10 days from the date of such service. If no entry of appearance is filed, no further filings need be served on the Attorney General.

GM served the Attorney General with an electronic copy of the petition for review as indicated on the certificate of service. GM even filed a notice with this Court showing that the Attorney General's office acknowledged receipt of the petition for review via email with an attached file-stamped copy of

-13-

the petition marked as received by the Office of the Attorney General. However, the certificate of service on Woods' response to the petition for review does not list the Attorney General.[12] Nor has GM expressly indicated that it served a copy of the response to the petition for review on the Attorney General – despite being the party challenging the constitutional validity of KRS 342.040.

Perhaps some might construe RAP 49(G)(3) to mean that the Attorney General had ten days after receiving service of the petition to file an entry of appearance and that service of the response was no longer required after the Attorney General failed to file an entry of appearance within ten days of service of the petition. But RAP 49(G)(3) explicitly requires that the Attorney General must be served with both the petition for review and the response by the party challenging the statute's validity – before then stating that the Attorney General has ten days to file an entry of appearance "from the date of such service." We must construe "such service" to refer to service of both the petition for review and

---

[12] *Cf. Bean v. Collier Electric Service*, No. 2020-CA-000321-WC, 2020 WL 2603597, at *6 (Ky. App. May 22, 2020) (unpublished) (addressing constitutional issue as "Bean's petition and Collier's response both provide statements certifying they were served upon the Kentucky Attorney General prior to being filed with this Court" thus satisfying the requirements of former Kentucky Rule of Civil Procedure ("CR") 76.25(8) which, similarly to RAP 49(G)(3) stated: "In any case in which the constitutionality of a statute is questioned, a copy of the petition and response shall be served on the Attorney General of the Commonwealth by the party challenging the validity of the statute."). We recognize that *Bean* is not binding since it is an unpublished opinion. RAP 41(A). However, we cite *Bean* because this Court noted its awareness of the Attorney General's being served with both the petition for review and the response before addressing a constitutional challenge to a statute.

the response since the preceding sentence clearly requires the party challenging the statute's constitutional validity to serve the Attorney General with both the petition for review and the response. And though RAP 49(G)(3) differs from KRS 418.075(1)-(2) in requiring service of the response in addition to service of the petition for review, we cannot ignore the plain language of this court rule. *See Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 296 (Ky. 2010) ("[A]s with statutes, we interpret the civil rules in accordance with their plain language.").

If service of the petition for review alone triggered the ten-day time limit for the Attorney General to file an entry of appearance, RAP 49(G)(3) would explicitly state that the Attorney General has ten days to file an entry of appearance after receiving service of the petition for review. Instead, RAP 49(G)(3) states that the Attorney General has ten days to file an entry of appearance "from the date of such service" after the preceding sentence clearly states the party challenging the statute's constitutionality must serve the Attorney General with both the petition for review and the response. So, the fact that the Attorney General did not file an entry of appearance within ten days of receiving service of the petition for review does not excuse the failure to serve the Attorney General with the response to the petition for review.

In short, RAP 49(G)(3) clearly requires that the party challenging the constitutionality of a Kentucky statute in a workers' compensation appeal must

-15-

serve the Attorney General with not only the petition for review but also with the response to the petition.  GM has failed to show that it served the Attorney General with the response though it did serve the Attorney General with the petition for review.  Therefore, GM did not strictly comply with the requirements of RAP 49(G)(3) so we decline to address the constitutional issue.

> As our Supreme Court stated in a workers' compensation case:
>
> > an appeal brought by grant of a statute is subject to strict compliance with the statute's dictates.  The appellate court's jurisdiction is not properly invoked unless the party seeking to do so meets the conditions precedent to the appellate court's exercise of jurisdiction.  KRS 342.290 subjects the Court of Appeals' review of the Board's decisions to the rules of the Supreme Court.

*Belsito v. U-Haul Co. of Kentucky*, 313 S.W.3d 549, 551 (Ky. 2010) (footnotes omitted).  Our Supreme Court affirmed the Court of Appeals' dismissal of a workers' compensation appeal for failure to comply with former CR 76.25(8)'s requirement that the Board be served with a copy of the petition for review, stating: "Belsito's failure to comply with CR 76.25 precluded the Court of Appeals from exercising jurisdiction over the merits of his appeal." *Id.*

Failure to strictly comply with the requirement to serve the Board results in this Court lacking jurisdiction over a workers' compensation appeal and having to dismiss the appeal.  Similarly, this Court cannot properly address a challenge to the constitutionality of a Kentucky statute when there is lack of strict

compliance with RAP 49(G)(3)'s requirement that the Attorney General be served with both the petition for review and the response.

Applying a similar requirement in former CR 76.25(8) that the petition for review and the response in a workers' compensation appeal challenging the constitutionality of a statute must be served on the Attorney General, this Court stated it must not address a constitutional challenge to a statute because: "The record does not reflect that Austin Powder [the party challenging the constitutionality of a statute] complied with the notification requirements of CR 76.25(8) and KRS 418.075(2)." *Austin Powder Company v. Stacy*, 495 S.W.3d 732, 737 (Ky. App. 2016). However, this Court did not specifically discuss in *Stacy* whether the Attorney General received service of the petition for review, the response or neither.

Therefore, we recognize that there is no prior published Kentucky precedent specifically addressing whether the Court of Appeals may properly address a constitutional challenge to a Kentucky statute in a workers' compensation case where the Attorney General has been served with the petition for review but there is no indication that the Attorney General has been served with the response to the petition. However, RAP 49(G)(3) – like former CR 76.25(8) – explicitly requires that the Attorney General be served with both the petition for review and the response if the constitutionality of a statute is challenged in a

workers' compensation case. And our Supreme Court has stated that strict compliance with court rules governing workers' compensation appeals is required. *Belsito*, 313 S.W.3d at 551. We are bound by this published precedent from our Supreme Court, SCR 1.030(8)(a), and must follow and enforce the Rules of Appellate Procedure adopted by our Supreme Court via Administrative Order 2022-49, https://www.kycourts.gov/Courts/Supreme-Court/Supreme%20Court%20Orders/202249.pdf (last accessed Oct. 9, 2024). So, we must decline to address GM's challenge to the constitutionality of KRS 342.040's interest provisions.

Further arguments advanced by the parties which are not discussed herein have been determined to lack merit or relevancy to our resolution of this appeal from the Board's opinion.

## CONCLUSION

For the foregoing reasons, we AFFIRM.

CETRULO, JUDGE, CONCURS.

ECKERLE, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

ECKERLE, JUDGE, CONCURING IN PART AND DISSENTING IN PART: While I agree with the majority's conclusion that we should not address the constitutional issue because GM did not comply with the Rules of Appellate Procedure in serving the Attorney General with the petition for review and response, I must respectfully dissent from the ruling on the merits that Woods met

-18-

her burden of proving her average weekly wage. Woods did not testify about GM's payment records or the amount of vacation she accrued in any given time period. Instead, she sought and was granted 56 hours of vacation pay that she had not used in addition to a 40-hour work week to calculate her average weekly pay. By including this generous, apparently one-time, lump-sum vacation payout for accrued time, her actual wage was artificially and significantly inflated. This manner of calculation applied towards Woods' average weekly wage contravenes the purpose of the statute and finds no support in its language. Because this Opinion is designated to be published, it can be cited as precedent and construed to authorize such gross overpayments in contravention of the public policy behind the statute.

As the majority notes, KRS 342.140(1)(d) specifically delineates the method of calculating the average weekly wage for an injured employee whose wages are fixed by time or output. This section clearly excludes overtime or premium pay from the initial calculation.

The goal of KRS 342.140 in calculating the average weekly wage is to ensure that the claimant's benefit rate is based upon what the worker would have expected to earn had the injury not occurred. *Commonwealth, Uninsured Employers' Fund v. Sidebottom*, 509 S.W.3d 701, 704 (Ky. 2017). While the statute does not restrict the calculation of an average weekly wage to a 40-hour

work week, the Kentucky Supreme Court has interpreted it to exclude overtime or premium pay in excess of the employee's regular hourly rate. *The Gap v. Curtis*, 142 S.W.3d 111, 112 (Ky. 2004)[13] (citing *R.C. Durr Co., Inc. v. Chapman*, 563 S.W.2d 743, 745 (Ky. App. 1978)).

Unfortunately, the legislature has not provided a clear statutory direction on the method that should be used to treat vacation pay that is accrued but not taken in calculating an employee's average weekly wage. Likewise, no existing case law addresses vacation payoffs under the scenario we address here. In *Rainey v. Mills*, 733 S.W.2d 756, 758 (Ky. App. 1987), this Court held that "fringe benefits" such as employer contributions to a pension plan, health insurance, and life insurance are not to be included in the calculation of average weekly wage, based on the express provisions of KRS 342.140(6). Similarly, in *Pendygraft v. Ford Motor Company*, 260 S.W.3d 788 (Ky. 2008), the Kentucky Supreme Court concluded that profit-sharing bonuses cannot be included in an employee's average weekly wage:

> We acknowledge that workers sometimes receive profit-sharing in lieu of wages but are not convinced that KRS 342.140(6) requires such payments to be included in the average weekly wage calculation. To the extent that an employee works in exchange for profit-sharing, the

---

[13] Curiously, GM cited only to the prior de-published opinion of this Court in *The Gap v. Curtis*, No. 2002-CA-001547-WC, 2003 WL 22064369 (Ky. App. Sep. 5, 2003), rather than the subsequent published opinion of the Supreme Court. In any event, the reasoning and result of both opinions are substantially the same.

employee's actual hourly wage is not fixed or cannot be determined. KRS 342.140(1)(f) bases such an individual's average weekly wage on the usual wage for similar services when rendered by a paid employee, a basis that is independent of a particular employer's profits and that is consistent with the purposes of KRS 342.730(1)(b) and (1)(c)2.

*Id.* at 792.

The issue in this case is whether the lump-sum vacation payout should be treated as wages for purposes of calculating Woods' average weekly wage. The statute specifies that premium and overtime pay is excluded. The only binding Kentucky case law holds that fringe benefits and profit-sharing payments are excluded from such calculations. By analogy, vacation payouts should be as well. Supplemental pay offered in return for unused vacation time is an extra benefit provided by the employer as part of the employee's earnings just like those listed above by the Kentucky Supreme Court.

Moreover, there is persuasive reasoning in non-binding, federal case law on this very issue. While, as the majority notes in dismissing them, these cases are not authoritative, their analysis is nonetheless instructive given that the statutory schemes are similar, and there is no controlling precedent. Notably, in *Ingalls Shipbuilding, Inc. v. Wooley*, 204 F.3d 616, 617 (5th Cir. 2000), the Fifth Circuit Court of Appeals addressed the inclusion of vacation pay in the calculation of an employee's average weekly wage under the Federal Longshore and Harbor

-21-

Workers' Compensation Act. Like KRS 342.140(1)(d), the Federal Act aims at a theoretical approximation of what a claimant could ideally have been expected to earn in the year prior to her injury. 204 F.3d at 618.

In *Wooley*, the employee was paid for 120 vacation hours during the relevant pay period. The Fifth Circuit declined to set a bright-line rule that treated the vacation payments as earnings. Rather, the Court concluded that it was a fact-specific inquiry concerning "whether a particular instance of vacation compensation counts as a 'day worked' or whether it was 'sold back" to the employer for additional pay." *Id.* Thus, when the employee took vacation days, that time properly counted as a "day worked," but when she instead received additional compensation for the accrued time, she "sold back" her vacation for additional pay. *Id. See also Trachsel v. Rogers Terminal & Shipping Corp.*, 597 F.3d 947, 951 (9th Cir. 2010). This time could not count as working wages. This reasoning is compelling and applicable in the current case.

Regular vacation and sick time taken are a benefit provided by the employer as part of the employee's earnings. But extra vacation time not taken, and yet paid for in return, should not be counted as time worked for purposes of calculating average wages. Woods bore the burden of proof to show that it should be. She categorically failed to present evidence on this issue. Her average weekly

wage is an essential element of her claim. *Nesco v. Haddix*, 339 S.W.3d 465, 472 (Ky. 2011).

Nonetheless, Woods did not offer any evidence that the lump-sum payment of accrued vacation pay replaced income that would have been earned during any particular pay period. Indeed, the vacation payoff exceeded Woods' usual work week of 40-48 hours. Most notably, the vacation payoff line item appears in only one week of the entire period, while several weeks show $0 in pay. As in *Wooley*, the ALJ in this case properly included the vacation and sick time that Woods actually took during the relevant weeks.

But in the complete absence of any evidence regarding the basis for the lump-sum vacation payout for time that Woods did not take, that amount should be treated as being "sold back" for additional pay. Otherwise, the average weekly wage is artificially inflated and does not reflect what Woods would have expected to earn had the injury not occurred. Given the dearth of any evidence, let alone substantial evidence, there can be no proper finding that she is entitled to use this additional pay to increase her wage calculation. Therefore, I would reverse the Board and remand this matter back to the ALJ with instructions to exclude this payoff amount in calculating Woods' average weekly wage.

BRIEF FOR APPELLANT:

Jeremy Faulk
Louisville, Kentucky

BRIEF FOR APPELLEE BRANDI
WOODS:

Michael Thomas Kunjoo
Lexington, Kentucky